No. 54,528

KANSAS BOARD OF REGENTS and PITTSBURG STATE UNIVERSITY, *Appellants,* v. PITTSBURG STATE UNIVERSITY CHAPTER of KANSAS-NATIONAL EDUCATION ASSOCIATION, and PUBLIC EMPLOYEE RELATIONS BOARD, *Appellees.*

(667 P.2d 306)

Opinion filed July 15, 1983.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause; *Mary Kathleen Babcock* and *Larry G. Rapp,* of the same firm, and *Robert N. Partridge,* special assistant attorney general, *Reid Stacey,* assistant attorney general, and *Robert T. Stephan,* attorney general, were with him on the brief for appellant.

*C. A. Menghini,* of Menghini & Menghini, of Pittsburg, argued the cause and was on the brief for appellee Pittsburg State University Chapter of Kansas-National Education Association.

*Arnold Berman,* of Kansas Department of Human Resources, argued the cause and was on the brief for appellee Public Employee Relations Board.

The opinion of the court was delivered by

MILLER, J.: The Board of Regents and Pittsburg State University appeal from a decision of the Shawnee District Court affirming orders of the Public Employee Relations Board in three cases arising under the Public Employer-Employee Relations Act, K.S.A. 75-4321 *et seq.* All three cases relate to prohibited practices charges which arose during attempted employer-employee negotiations pursuant to the Act.

The appellants are the Board of Regents (the Regents) and Pittsburg State University (the University). Appellees are the Pittsburg State University Chapter of the Kansas-National Education Association (KNEA) and the Public Employee Relations Board (PERB). The Public Employer-Employee Relations Act, K.S.A. 75-4321 *et seq.,* will be referred to as "the Act" or as "the PEER Act."

The principal issues presented are the proper scope of judicial review of PERB orders; whether the Board of Regents is the "public employer" of the Pittsburg State University faculty under the Act; whether PERB properly interpreted the duration clause in a contract; and the correctness of PERB's findings as to the proper subjects of mandatory negotiations between the employer and a recognized employee organization pursuant to the Act. Before taking up the specific issues involved in this appeal,

we shall first discuss the Act and then the facts surrounding each of the cases giving rise to this appeal.

The Public Employer-Employee Relations Act was enacted by the 1971 Legislature and became effective on March 1, 1972. The first section of the Act, K.S.A. 75-4321, sets forth the legislative policy and the purposes of the Act. It reads:

"(a) The legislature hereby finds and declares that:

"(1) The people of this state have a fundamental interest in the development of harmonious and cooperative relationships between government and its employees;

"(2) the denial by some public employers of the right of public employees to organize and the refusal by some to accept the principle and procedure of full communication between public employers and public employee organizations can lead to various forms of strife and unrest;

"(3) the state has a basic obligation to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government;

"(4) there neither is, nor can be, an analogy of statuses between public employees and private employees, in fact or law, because of inherent differences in the employment relationship arising out of the unique fact that the public employer was established by and is run for the benefit of all the people and its authority derives not from contract nor the profit motive inherent in the principle of free private enterprise, but from the constitution, statutes, civil service rules, regulations and resolutions; and

"(5) the difference between public and private employment is further reflected in the constraints that bar any abdication or bargaining away by public employers of their continuing legislative discretion and in the fact that constitutional provisions as to contract, property, and due process do not apply to the public employer and employee relationship.

"(b) Subject to the provisions of subsection (c) [relating to public employers other than the state and its agencies], it is the purpose of this act to obligate public agencies, public employees and their representatives to enter into discussions with affirmative willingness to resolve grievances and disputes relating to conditions of employment, acting within the framework of law. It is also the purpose of this act to promote the improvement of employer-employee relations within the various public agencies of the state and its political subdivisions by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice, or to refrain from joining, and be represented by such organizations in their employment relations and dealings with public agencies."

The Act extends to all persons employed by the State of Kansas and its agencies, except supervisory employees, professional employees of school districts, elected and management officials, and confidential employees. The Act is administered by the five-member Public Employee Relations Board which is empowered to make rules and regulations, establish procedures for

the prevention of improper public employer and employee practices, hold hearings and enforce the attendance of witnesses and the production of documents, conduct employee elections, and determine recognized employee organizations and hear and determine controversies concerning prohibited practices.

The Act, as provided in K.S.A. 75-4321(*b*), imposes upon public employers and recognized public employee organizations the obligation "to enter into discussions with affirmative willingness to resolve grievances and disputes relating to conditions of employment." The Regents and the University contend that the Act is solely a "meet and confer act," which is the most limited kind of interchange in labor relations. KNEA and PERB, on the other hand, argue that the legislature has expressly rejected limiting the Act and that it is a "collective negotiations act." Professor Raymond Goetz, in his most informative analysis of the Act, *The Kansas Public Employer-Employee Relations Law*, 28 Kan. L. Rev. 243, 282-87 (1980), describes both types of proceedings and concludes that "the Act in substance provides a 'hybrid' combining some characteristics of pure meet and confer with other characteristics of collective bargaining." We agree. "Meet and confer" acts basically give the public employee organizations the right to make unilateral recommendations to the employer, but give the employer a free hand in making the ultimate decision recommending such proposals. The Kansas Public Employer-Employee Relations Act, on the other hand, imposes mandatory obligations upon the public employer and the representatives of public employee organizations not only to meet and confer, but to enter into discussions in good faith *with an affirmative willingness to resolve grievances and disputes* and to promote the improvement of employer-employee relations. K.S.A. 75-4321(*b*); K.S.A. 1982 Supp. 75-4327(*b*); K.S.A. 75-4333(*b*)(5) and (*c*)(3). "Meet and confer in good faith" is defined in K.S.A. 75-4322(*m*) as follows:

" 'Meet and confer in good faith' is the process whereby the representative of a public agency and representatives of recognized employee organizations have the mutual obligation personally to meet and confer in order to exchange freely information, opinions and proposals *to endeavor to reach agreement on conditions of employment.*" (Emphasis added.)

We conclude that the Act is not a strict "meet and confer" act nor is it a "collective negotiations" act, but as Professor Goetz has

stated, it is a hybrid containing some characteristics of each. However it be designated, the important thing is that the Act imposes upon both employer and employee representatives the obligation *to meet, and to confer and negotiate in good faith, with affirmative willingness to resolve grievances and disputes,* and to promote the improvement of public employer-employee relations.

The three cases presented to PERB, out of which these appeals arose, are designated as "case 20," "case 21," and "the 1982 case." The first two arose in 1980. The University, the Regents and KNEA entered into written agreements for the academic years 1978-1979 and 1979-1980. Both of these agreements contained a "duration clause" which, for the 1979-1980 academic year, reads as follows:

"This Agreement shall become effective August 1, 1979, and shall terminate on July 31, 1980.

"On or before January 1, 1980, either party may notify the other that it desires to modify the agreement. In such event, the parties shall begin on or after January 7, 1980, to meet and confer with respect to a successor agreement.

"The Association and the University agree that should either legislation or policy changes occur during the term of this Agreement that would permit modification of this Agreement, meeting and conferring on the topic involved may occur following such a request by either party to resume discussions."

The earlier agreement contained an identical clause except for the relevant dates.

January 1, 1980, passed without notification by either party that it desired to modify the agreement. Within a week, the president of the University disbanded the employer's negotiating team with instructions that they should expect to meet with KNEA on salary matters when legislative appropriations were decided, perhaps in mid-April. The University and the Regents contend that under the contract, notification prior to January 1, 1980, was mandatory in order to provide for negotiations for a successor agreement. KNEA, on the other hand, argues that the January 1 date was not intended as a mandatory deadline but that the date was a cut-off date for any modification of the then-operating 1979-1980 agreement. On January 25, 1980, KNEA, unaware of appellants' interpretation of the duration clause and of the disbanding of the employer's negotiating team, formally requested an opening of negotiations for a successor agreement for the 1980-1981 academic year. Various exchanges of corre-

spondence followed and on March 28, 1980, the parties held a meeting at which time KNEA submitted a number of non-salary proposals. It asked for a response from the employer's negotiating team. None was forthcoming and the KNEA team indicated that it would not return to the bargaining table until it received the employer's proposals. The University then filed a prohibited practice charge with PERB, contending that KNEA had violated K.S.A. 75-4333(c)(3) by imposing preconditions to future sessions. This charge was dropped when representatives of the parties agreed that they would not attempt to impose preconditions to future sessions.

The parties returned to the table on May 29, 1980. At this time the employer's team presented written proposals covering salary and other matters. On the cover page of the proposal appeared the following:

> "NOTE: Because neither party notified the other of the desire to modify their existing agreement before January 1, 1980, meeting and conferring is limited to topics related to legislative or policy changes. This proposal is submitted only on the specific understanding that it be acknowledged by KNEA that Pittsburg State University reserves the right to limit topics for meeting and conferring to those relating to legislative and policy changes."

KNEA saw this Note as a precondition to future negotiations, fearing that if KNEA proceeded with negotiations in the face of this notice, it would be giving up the right to factfinding and mediation. At one of the subsequent meetings, one of the employer representatives indicated that the purpose of the Note was to acknowledge the employer's contractual right under the duration clause to avoid impasse and factfinding proceedings on non-salary items. This was unacceptable to KNEA. It then proposed that the parties sign a written memorandum of understanding, continuing the 1979-1980 contract for another year unless the parties could reach a different agreement. This was unacceptable to the University and the Regents. The negotiations were thus stalled. KNEA then filed a prohibited practice charge with PERB, "Case 20," alleging that the Regents, acting through the University, had violated K.S.A. 1982 Supp. 75-4327(b) by failing to meet and confer in good faith; K.S.A. 75-4333(b)(1) by interfering, restraining or coercing public employees in the exercise of their rights; K.S.A. 75-4333(b)(5) by refusing to meet and confer in good faith; and K.S.A. 75-

4333(*b*)(7) by intentionally avoiding mediation or factfinding. The matter was presented to a hearing examiner and eventually was decided by PERB, which, in a four-to-one decision, found for the complainant, KNEA, and held that the refusal of the Board of Regents acting through the University to negotiate based on the "duration clause" contained in the 1979-1980 agreement amounted to a refusal to meet and confer in good faith. It found the Regents' and the University's interpretation of the "duration clause" to be "devoid of substance."

Case 21 arose when the parties could not agree whether or not the subject of "retrenchment" is mandatorily negotiable. The parties stipulated before the hearing examiner to the following definition of "retrenchment":

"[R]etrenchment means reduction in force and includes the method and procedures used for reduction of personnel, how personnel are to be laid off and establishment of procedures for recall of personnel."

Retrenchment was one of the items proposed by KNEA for negotiation when the parties were meeting in the spring of 1980. While this matter was "on the table," the University president on June 17, 1980, implemented a faculty election procedure to produce a faculty committee to establish retrenchment procedures. The president had previously approached the faculty senate, an elected representative body of the teaching faculty, on several occasions, suggesting that that body assist with the development of retrenchment procedures. The senate and the faculty as a whole passed resolutions indicating that they wanted KNEA to represent their interests on retrenchment. These resolutions were ignored.

Late in June, 1980, KNEA filed a prohibited practice charge against the Regents and the University, alleging that the unilateral implementation of retrenchment procedures violated K.S.A. 75-4333(*b*)(5), failing to meet and confer on the subject in good faith, and other sections of the statute. After a hearing, PERB determined that retrenchment as defined by the parties was a mandatory subject for meeting, conferring and negotiating, but that, because there was a good faith dispute as to negotiability, the Regents and the University were not guilty of a prohibited practice.

The 1982 case involves a charge filed by the University against KNEA, alleging that by insisting that certain subjects were

mandatorily negotiable, KNEA violated K.S.A. 75-4333(c)(2) and (3) by refusing to meet and confer in good faith and by interfering with, restraining, or coercing a public employer with respect to management rights granted under the Act. PERB eventually held that all of the items but one were mandatorily negotiable and that KNEA was not guilty of a prohibited practice in insisting upon the various subjects for negotiation. The one topic held not mandatorily negotiable was "academic freedom." There was no appeal from that finding and the topic of academic freedom is therefore not before us. The items which PERB held to be mandatorily negotiable are: salary generation and salary allocation; out-of-state travel; promotions; summer employment; tenure; retrenchment; and access to personnel files. The district court affirmed PERB in all respects; the Regents and the University appeal.

## SCOPE OF REVIEW

The scope of judicial review of an administrative board's findings of fact and conclusions of law is well established in Kansas law. In addition, K.S.A. 75-4334(b) provides that PERB findings *as to the facts* "shall be conclusive [on review] unless it is made to appear to the court's satisfaction that the findings of fact were not supported by substantial evidence and the record considered as a whole."

In *Kansas Ass'n of Public Employees v. Public Service Employees Union,* 218 Kan. 509, 511, 544 P.2d 1389 (1976), this court noted the statute quoted above and elaborated:

"We thus have an unequivocal statement that in reviewing the action of the Public Employee Relations Board the courts shall apply the customary standards for the review of the acts of an administrative agency. The leading case on that issue is *Kansas State Board of Healing Arts v. Foote,* 200 Kan. 447, 436 P.2d 828 [1968], where we said:

" 'A district court may not, on appeal, substitute its judgment for that of an administrative tribunal, but is restricted to considering whether, as a matter of law, (1) the tribunal acted fraudulently, arbitrarily or capriciously, (2) the administrative order is substantially supported by evidence, and (3) the tribunal's action was within the scope of its authority.' (Syl. ¶ 1.)

"In *Foote* we also summed up this court's role on appellate review:

" 'In reviewing a district court's judgment, as above, this court will, in the first instance, for the purpose of determining whether the district court observed the requirements and restrictions placed upon it, make the same review of the administrative tribunal's action as does the district court.' (Syl. ¶ 2.)

Neither the district court nor this court can weigh conflicts in the

evidence and substitute its judgment for that of the Board. *In re Appeal of City of Lenexa,* 232 Kan. 568, Syl. ¶¶ 4, 5, 657 P.2d 47 (1983); *Kansas Dept. of Health & Environment v. Banks,* 230 Kan. 169, 172, 630 P.2d 1131 (1981); and *Coggins v. Public Employee Relations Board,* 2 Kan. App. 2d 416, 419, 581 P.2d 817, *rev. denied* 225 Kan. 843 (1978). There is no indication that the trial judge misunderstood his role here.

The PERB orders in this case are partly factual determinations, which are subject to the review stated above, and partly determinations of law, which involve a different standard of review. Usually, however, the legal interpretation of a statute by an administrative board or agency, charged by the legislature with the authority to enforce the statute, is entitled to a great deal of judicial deference. In *Richardson v. St. Mary Hospital,* 6 Kan. App. 2d 238, 242, 627 P.2d 1143, *rev. denied* 229 Kan. 671 (1981), the court noted that:

"In reviewing questions of law, the trial court may substitute its judgment for that of the agency, although ordinarily the court will give deference to the agency's interpretation of the law."

This deference has long been reflected in Kansas law. In *Harrison v. Benefit Society,* 61 Kan. 134, 140, 59 Pac. 266 (1899), it is said:

"The rule is well settled that 'in all cases of ambiguity the contemporaneous construction not only of the courts but of the departments, and even of the officials whose duty it is to carry the law into effect, is controlling.'"

See also *Southwestern Bell Telephone Co. v. Employment Security Board of Review,* 189 Kan. 600, 607, 371 P.2d 134 (1962) ("[T]he operative interpretation given thereto by the officers and official boards whose duties are to carry the legislative policy into effect is helpful, and may be entitled to controlling significance . . . in judicial proceedings."); *State v. Helgerson,* 212 Kan. 412, 413, 511 P.2d 221 (1973) ("This court has long given great weight under the doctrine of operative construction to the interpretation of a statute by the administrative body charged with enforcing the statute."). Deference is likewise accorded by the courts to an administrative agency's construction and interpretation of its own rules and regulations. The agency's interpretation of its regulations will not be disturbed on appeal unless the interpretation is clearly erroneous or inconsistent with the regulation. *Columbian Fuel Corp. v. Panhandle East-*

*ern Pipe Line Co.,* 176 Kan. 433, 440, 271 P.2d 773 (1954); *McClanahan v. Mulcrome,* 636 F.2d 1190 (10th Cir. 1980).

A similar standard of review is applicable when the administrative agency has construed or interpreted a written contract or other document, and such construction or interpretation, reflected in the agency's order, is challenged upon appeal. The construction or interpretation of contracts is, of course, a question of law. However, and particularly if the writing is an instrument of a type which comes regularly before the agency and with which it must of necessity acquire some familiarity and expertise, its interpretation, if reasonable, is persuasive and is entitled to careful consideration by the reviewing courts. If there is a rational basis for the agency's decision, it should be upheld and a reviewing court should not substitute its judgment for that of the agency. The rule stated in 2 Am. Jur. 2d, Administrative Law § 676, p. 556, is particularly applicable here:

"The ruling of an administrative agency on questions of law, while not as conclusive as its findings of facts, is nevertheless persuasive and given weight, and may carry with it a strong presumption of correctness, especially if the agency is one of special competence and experience."

If, however, the reviewing court finds that the administrative body's interpretation is erroneous as a matter of law, the court should take corrective steps; the determination of an administrative body on questions of law is not conclusive, and, while persuasive, is not binding on the courts. See *Beacon Publishing Co. v. Burke,* 143 Kan. 248, 253, 53 P.2d 888 (1936); *Allen v. Burke,* 143 Kan. 257, 262, 53 P.2d 894 (1936); 73 C.J.S., Public Administrative Bodies and Procedure § 228.

### THE PUBLIC EMPLOYER

The Regents raised an affirmative defense in case 20 and in case 21, claiming that the Board of Regents is not the proper respondent in these matters and that it is not the "public employer" under the Act. This issue was hotly disputed. Depositions of a number of the members of the Board of Regents were taken as well as those of members of its staff. Some two days were spent in hearings on this issue alone. PERB determined that the Board of Regents is the public employer and that its negotiating team consisted of its designated representatives; that the Regents are the "ultimate authority," and are properly designated as the public employer in these proceedings.

Article 6, section 2, of the Constitution of the State of Kansas provides:

"(b) The legislature shall provide for a state board of regents and for its control and supervision of public institutions of higher education. Public institutions of higher education shall include universities and colleges granting baccalaureate or postbaccalaureate degrees and such other institutions and educational interests as may be provided by law. The state board of regents shall perform such other duties as may be prescribed by law."

By K.S.A. 1982 Supp. 74-3201 *et seq.*, the legislature created a nine-member state board, to be known as the Board of Regents. Specific powers and duties of the Board are set forth in the following sections of the statutes. The Regents appoint the chief executive officers of all state educational institutions under their jurisdiction, including Pittsburg State University. These state educational institutions are controlled by, operated, and managed under the supervision of the Board of Regents. The Regents are authorized by statute to make contracts and adopt orders, policies, or rules and regulations and to do or perform such other acts as are authorized by law or are appropriate for such purposes. K.S.A. 76-711, -712, -714. The Board of Regents may be sued and may defend any action brought against it or against any state educational institution; state educational institutions also may be sued and may defend actions brought against them. K.S.A. 76-713. The chief executive officer of each state educational institution is authorized to appoint such employees as are authorized by the Board of Regents; employees in unclassified service serve at the pleasure of the chief executive officer, subject to policies approved by the Board of Regents. The Regents determine the programs which shall be offered and the degrees which may be granted at each state educational institution. K.S.A. 76-715, -716.

Several sections of the Public Employer-Employee Relations Act are also pertinent to this discussion. K.S.A. 75-4322(f) defines "public employer" as "the state of Kansas and its state agencies." K.S.A. 75-4322(x) defines "state agency" by reference to K.S.A. 1982 Supp. 75-3701(3), "any state . . . board . . . ." K.S.A. 75-4322(g) defines "governing body" as the "policy board . . . of the public employer possessing . . . policymaking responsibilities pursuant to the constitution or laws of this state." For the purposes of attendance at the meet and confer or bargaining sessions, K.S.A. 75-4322(h), with reference

to state agencies, defines "representative of the public agency" as "a team of persons, the head of which shall be a person designated by the secretary of administration and the heads of the state agency or state agencies involved or one person [designated] by each such state agency head."

Without detailing the evidence, we think it is clear beyond question that the Board of Regents is the ultimate authority. It must direct and be responsible for negotiations with the employee teams at the several state educational institutions under its jurisdiction, and it, as the employer and "the appropriate governing body," must approve any proposed agreement in order to make it binding and effective. K.S.A. 75-4331. The Board of Regents did in fact approve the 1978-1979 and 1979-1980 agreements, as well as agreements with other recognized employee organizations for other state educational institutions. We conclude that PERB and the district court were correct in holding that the Board of Regents is the appropriate employer under the Act.

### THE DURATION CLAUSE

The next issue is whether PERB erred in its interpretation of the "duration clause" in the 1979-1980 contract and in concluding that the Regents refused to meet and confer in good faith.

The duration clause provides in substance that the agreement is effective for one year only, and that it terminates on July 31, 1980. It provides that on or before January 1, 1980, either party may notify the other that it desires to modify the agreement; in such event, the parties shall begin on or after January 7, 1980, to meet and confer with respect to a successor agreement.

The Regents and the University read this clause to mean that if no notice was served on or before January 1, 1980, there would be no negotiations with respect to a 1980-1981 agreement until after the 1979-1980 agreement expired. Under that interpretation, there would be no attempt to negotiate an agreement for the ensuing academic year—and no hope of reaching an agreement for the next year—until that year was well under way. Such a construction would frustrate the law and its purposes as enumerated by the legislature.

The Act, as we pointed out earlier, has as its purpose the development of harmonious and cooperative relationships between government and its employees, and it obligates public

agencies and public employee representatives to enter into discussions in good faith for the purpose of resolving grievances and disputes relating to conditions of employment. Interpreting the contract so as to completely frustrate all attempts of one party to negotiate terms and conditions of employment for the succeeding academic year until after that year is underway would not serve to further the purposes of the Act. There is no continuing contract clause in the Act, and there is no continuing contract clause in the 1979-1980 agreement. The Regents' negotiating team declined or at least did not accept an offer to continue the existence of that agreement for the following year.

The Regents argue that the failure to provide a January 1 notice entitled the employer to a period of repose free from "labor strife." KNEA, on the other hand, argues that the purpose of the disputed paragraph was to provide a period of repose from the first of the academic year until January 1, and that there would be no negotiations during the fall semester. The paragraph indeed served that purpose; there were no negotiations during the fall of 1979. When January 1, 1980, passed without notice being served, there could thereafter be no modifications in the 1979-1980 agreement. The new 1980-1981 agreement, however, was still open for negotiations.

It is apparent that the language of the duration clause can be read in two very different ways; it is therefore ambiguous. It must be read, however, in light of the Act, and when it is so read there can be no doubt that KNEA's interpretation, that adopted by PERB and the district court, more closely comports with the Act's stated purposes. We conclude that PERB and the trial court did not err in their interpretation of the duration clause.

The Regents' interpretation of the duration clause, and the inclusion of the Note which was intended to avoid impasse and factfinding proceedings as a precondition to negotiations, support PERB's finding that the Regents refused to meet and confer in good faith pursuant to the Act. The cases cited by appellants on this issue are distinguishable because they involve clearly established contractual procedures for triggering one party's obligation to bargain or negotiate with the other. We find no error.

## THE "SIGNIFICANTLY RELATED" TEST ADOPTED BY PERB

Before we turn to the specific subjects upon which the parties disagree as to mandatory negotiability, we should first consider some additional sections of the Act and the test adopted by PERB for resolving disputes over negotiability. We have stated in full in the early portion of this opinion the legislative policy and the general purposes of the Act, as codified in K.S.A. 75-4321, and we will not repeat that statement here. It is relied upon, however, by PERB, and it is important in the context of this discussion.

K.S.A. 75-4324 guarantees the following rights to public employees:

"Public employees shall have the right to form, join and participate in the activities of employee organizations of their own choosing, *for the purpose of meeting and conferring with public employers or their designated representatives with respect to grievances and conditions of employment.* Public employees also shall have the right to refuse to join or participate in the activities of employee organizations." (Emphasis added.)

### K.S.A. 75-4322(*t*) defines conditions of employment as follows:

"(*t*) 'Conditions of employment' means salaries, wages, hours of work, vacation allowances, sick and injury leave, number of holidays, retirement benefits, insurance benefits, prepaid legal service benefits, wearing apparel, premium pay for overtime, shift differential pay, jury duty and grievance procedures, but nothing in this act shall authorize the adjustment or change of such matters which have been fixed by statute or by the constitution of this state."

The public employer, however, is assured by K.S.A. 75-4326 that:

"Nothing in this act is intended to circumscribe or modify the existing right of a public employer to:
"(*a*) Direct the work of its employees;
"(*b*) Hire, promote, demote, transfer, assign and retain employees in positions within the public agency;
"(*c*) Suspend or discharge employees for proper cause;
"(*d*) Maintain the efficiency of governmental operation;
"(*e*) Relieve employees from duties because of lack of work or for other legitimate reasons;
"(*f*) Take actions as may be necessary to carry out the mission of the agency in emergencies; and
"(*g*) Determine the methods, means and personnel by which operations are to be carried on."

The scope of the memorandum of agreement reached by the

parties under the Act is described in K.S.A. 75-4330(*a*), which provides in relevant part:

"The scope of a memorandum of agreement *may extend to all matters relating to conditions of employment, except proposals relating to* (1) any subject preempted by federal or state law or by a municipal ordinance passed under the provisions of section 5 of article 12 of the Kansas constitution, (2) *public employee rights defined in K.S.A. 75-4324,* (3) *public employer rights defined in K.S.A. 75-4326* . . . ." (Emphasis added.)

The Act also establishes the Public Employee Relations Board and provides for its powers and duties in K.S.A. 1982 Supp. 75-4323. Subsection (*d*)(3) of that statute provides that PERB may:

"Make, amend and rescind such rules and regulations, *and exercise such other powers, as appropriate to effectuate the purposes and provisions of this act.*" (Emphasis added.)

Obviously, the language of the Act provides opportunities for disagreement over its "true" meaning. The dispute here involves "conditions of employment." KNEA proposed to meet and confer on various subjects. Because these items are not listed by name in the statutory laundry list of conditions of employment (K.S.A. 75-4322[*t*]), the Regents and the University refused to discuss them. In addition, they contend that to agree to procedures regarding these subjects would infringe on their rights as employer guaranteed in K.S.A. 75-4326, and thus violate K.S.A. 75-4330(*a*)(3). KNEA argues that too literal a reading of 75-4326 or of any other section of the Act would render the Act meaningless. They point out that almost any of the "conditions of employment" listed in 75-4322(*t*), which are the subjects of the meet and confer process under 75-4324, could be argued to interfere with employer rights under 75-4326. For example, "hours of work" is inconsistent with the employer's right to "direct the work of its employees," or "salary" negotiations may infringe upon the employer's right to "maintain the efficiency of [its] governmental operation." Conversely, KNEA argues that the 75-4322(*t*) list cannot be read as exclusive since some of the subjects listed state broad general categories rather than specific subjects. For example, salaries, wages, hours of work, retirement benefits, insurance benefits and grievance procedures are not single-faceted categories, with only one commonly accepted and easily understood component. The subjects are, in fact, multifa-

ceted and depend for their specifics upon the particular type of employment involved.

PERB, in order to determine whether a particular item is or is not mandatorily negotiable, has developed and employs a balancing test: If an item is *significantly related* to an express condition of employment, and if negotiating the item will not unduly interfere with management rights reserved to the employer by law, then the item is mandatorily negotiable.

PERB relies on the purpose language of K.S.A. 75-4321(*b*), which states:

"[I]t is the purpose of this act to obligate public agencies, public employees and their representatives to enter into discussions with affirmative willingness to *resolve grievances and disputes relating to conditions of employment,* acting within the framework of law." (Emphasis added.)

Thus, PERB concludes that the 75-4322(*t*) list is not literal or exclusive and that items which *relate* to the enumerated subjects must be negotiated upon request.

PERB's order enunciates its rationale. It says in part:

"In the opinion of this Board, the message of the legislature is clear and may be restated in the following manner relative to the question of negotiability; public employers and public employees are required to enter into *full communication* on all subject matters which *relate* to conditions of employment to the extent that those proceedings do not infringe upon the existing rights of public employers. There are at least two (2) possible highly polarized interpretations at which one could arrive in administering the Act. The first interpretation could find that every subject proposed for negotiations carries with it an economic cost and therefore has a direct effect on [an] individual's salary or wages and as such is a mandatorily negotiable subject within the purview of the statute. The second interpretation could find that all subjects proposed for negotiations infringe upon one or more of management's rights as outlined at K.S.A. 75-4326 and as such do not constitute subjects over which the public employer is obligated to bargain. In this Board's opinion both of the aforementioned interpretations are incorrect. The third interpretation, the one embraced by this Board recognizes both employers' and employees' rights under the law.

". . . Referring again to K.S.A. 75-4321(*a*)(2) wherein the legislature recognizes the harmful effect of a lack of *full communication,* the Board finds it impossible to believe that the purpose of K.S.A. 75-4326 is to so totally emasculate the meet and confer process. The Board is of the opinion, rather, that the legislature was attempting to recognize the fact that the extent to which an employer should be required to participate in the process should by all means stop short of an abdication of the authority necessary to accomplish their obligation 'to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government.'

"While it is extremely important to recognize that a management's rights clause does not preclude *all* negotiations in regard to those subjects it is equally

important to note that a subject does not become mandatorily negotiable by flimsily tying it to an enumerated subject term and condition." (Emphasis in original.)

PERB went on to review each of the items KNEA sought to negotiate and, applying the balancing test, determined that all of the items now before this court were negotiable conditions of employment. Appellants contend that the balancing test is improper and unlawful. They argue that the legislature clearly rejected such a test by specifically enumerating conditions of employment in 75-4322(*t*). The support appellants offer for this contention is the history of the Kansas Professional Negotiations Act (K.S.A. 72-5413 *et seq.*), which applies only to elementary, secondary and community college teachers. They point out that in 1970, when the Professional Negotiations Act (P N) was enacted, it did not contain a laundry list of negotiable items. The P N Act simply permitted the board of education and teachers' representatives to enter into an agreement concerning "terms and conditions of professional service." (L. 1970, ch. 284.) In contrast, this Act, enacted in 1971, contained the laundry list definition of "conditions of employment" now found at 75-4322(*t*) (except for "prepaid legal service" added in 1977).

Appellants also point out that under the original P N Act, this court established a test for defining the meaning of "terms and conditions of professional employment." In *National Education Association v. Board of Education*, 212 Kan. 741, Syl. ¶ 5, 512 P.2d 426 (1973) (*Shawnee Mission*), the court developed the "impact" test which provided that "[t]he key to determining whether an issue is negotiable or not is an assessment of how direct an impact it has on the well-being of the individual teacher, as opposed to its effect on the operation of the school system as a whole."

In 1977, the legislature amended the P N Act and added a scope of bargaining definition which enumerated several mandatory subjects and incorporated the *Shawnee Mission* "impact" test. (L. 1977, ch. 248, § 1.) The PEER Act was also amended in 1977 and section 75-4322(*t*) was amended to include "prepaid legal service benefits." (L. 1977, ch. 302, § 1.) Appellants find this significant. Finally, appellants point out that in 1980 the P N Act was again amended, and the scope of negotiations section was amended to lengthen the list of mandatorily negotiable

subjects. The "impact" test, however, was dropped from the definition. (L. 1980, ch. 220, § 1.) K.S.A. 75-4322($t$) has not been further amended. Based on this detailed history of the P N Act, the appellants conclude: "There is simply no statutory basis for engrafting an open-ended 'significantly related' scope test on the Public Employer-Employee Relations Act."

There are, however, significant differences in the two acts. The P N Act applies only to public school teachers and community college instructors. The PEER Act applies, with the few exceptions noted earlier, to all public employees of the State of Kansas and its agencies, and to all employees of certain other public employers opting to come under the Act. The Act is not limited in its coverage to persons in a given field or profession, but covers the entire spectrum of state employees—professional and nonprofessional, white collar and blue collar, artisan, tradesman, specialist and laborer. The two acts were enacted at different times to serve different purposes. The PEER Act contains an expansive statement of policy not found in the P N Act. There is nothing to indicate that the legislature intended its actions with regard to the P N Act to have controlling significance in interpreting the PEER Act or vice versa. PERB has been an active state agency since its creation by the legislature in 1971. Doubtless it has faced prior challenges as to what is or is not negotiable between public employers and public employee representatives, and has resolved such challenges by using the "significantly related" test. If the legislature in 1977 had desired to curtail the use of such a test, or to have made clearer the restrictions on negotiability urged by appellants, it could have done so.

One purpose of the Act is to obligate public agencies and employee representatives to enter into discussions to resolve grievances and disputes *relating to conditions of employment.* K.S.A. 75-4321(*b*). The primary purpose of the Public Employee Relations Board is obviously *to effectuate the purposes and provisions* of the Act. K.S.A. 1982 Supp. 75-4323. The scope of any memorandum of agreement reached by any public employer and any public employee organization *may extend to all matters relating to conditions of employment* except proposals relating to employer and employee rights as defined by the Act. K.S.A. 75-4330(*a*). Viewing the entire Act, with its broad statement of

purposes, we conclude that the legislature did not intend that the laundry list of conditions of employment as set forth in K.S.A. 75-4322(*t*) be viewed narrowly with the object of limiting and restricting the subjects for discussion between employer and employee. To the contrary, the legislature targets all subjects *relating to* conditions of employment.

PERB, as the arbiter between employer and employee, has fashioned the "significantly related" test in an effort to steer a middle course between minimal negotiability, with nearly absolute management prerogative, and complete negotiability, with few management prerogatives. In so doing it has devised a commonsense approach to the problem of sorting out matters which cannot be easily defined or neatly categorized, in order to determine their negotiability.

In fashioning such a test PERB is not without persuasive precedent. In *Clark Co. Sch. Dist. v. Local Gov't*, 90 Nev. 442, 530 P.2d 114 (1974), the Nevada Supreme Court approved a very similar ruling by the Local Government Employee-Management Relations Board. The Nevada court was faced with a statute which provided, at that time:

" '288.150 Negotiations by employer with recognized employee organization concerning wages, hours and conditions of employment; rights of employer without negotiation.

" '1. It is the duty of every local government employer, except as limited in subsection 2, to negotiate in good faith through a representative or representatives of its own choosing concerning *wages, hours, and conditions of employment* with the recognized employee organization, if any, for each appropriate unit among its employees. If either party requests it, agreements so reached shall be reduced to writing. Where any officer of a local government employer, other than a member of the governing body, is elected by the people and directs the work of any local government employee, such officer is the proper person to negotiate, directly or through a representative or representatives of his own choosing, in the first instance concerning any employee whose work is directed by him, but may refer to the governing body or its chosen representative or representatives any matter beyond the scope of his authority.

" '2. Each local government employer is entitled, without negotiation or reference to any agreement resulting from negotiation:

" '(a) To direct its employees;

" '(b) To hire, promote, classify, transfer, assign, retain, suspend, demote, discharge or take disciplinary action against any employee;

" '(c) To relieve any employee from duty because of lack of work or for any other legitimate reason;

" '(d) To maintain the efficiency of its governmental operations;

" '(e) To determine the methods, means and personnel by which its operations are to be conducted; and

&ldquo; &lsquo;(f) To take whatever actions may be necessary to carry out its responsibilities in situations of emergency.

&ldquo; &lsquo;Any action taken under the provisions of this subsection shall not be construed as a failure to negotiate in good faith.&rsquo; &rdquo; (Emphasis added.) 90 Nev. at 444-45.

A dispute had arisen between a school board and a local teachers' organization over what were the proper subjects of negotiation. The Employee-Management Relations Board ruled that the disputed matters were "significantly related" to conditions of employment and thus negotiable. The school board appealed and argued that the EMRB's ruling infringed upon its management rights as reserved in the statute and that the "significantly related" test fashioned by EMRB was unlawful. The court concluded:

"The appellant's interpretation of the act would render NRS 288.150 a nullity. The fact of the enactment of the legislation in itself evidences legislative intent that the statute serve a purpose and the stated purpose is to grant public employees a right that they did not have before which was to bargain collectively.

"It is not conceivable that the legislature would give its extensive time and attention to study, draft, meet, hear, discuss and pass this important piece of legislation were it not to serve a useful purpose. For this court to hold that any item even though remotely relevant to management policy is beyond the pale of negotiation defeats the purpose of the legislation. Many matters involved in a teacher's work day bear somewhat on management policy and at the same time are inextricably linked to wages, hours and conditions of employment. What the legislature gave was not intended to immediately be taken away.

. . . .

"A precise determination of the distinctions between Section 1 as subtracted by Section 2 cannot be divined. That is the function of the EMRB. Unless the board should act arbitrarily, unreasonably or capriciously beyond administrative boundaries the courts must give credence to the findings of the board. An agency charged with the duty of administering an act is impliedly clothed with power to construe it as a necessary precedent to administrative action. Oliver v. Spitz, 76 Nev. 5, 348 P.2d 158 (1960); Oklahoma Real Estate Commission v. National Business & Property Exchange, 238 F.2d 606 (10th Cir. 1956); Utah Hotel Co. v. Industrial Commission, 151 P.2d 467 (Utah 1944). Indeed, NRS 288.110 charges the board with that responsibility and great deference should be given to the agency's interpretation when it is within the language of the statute. Oliver v. Spitz, supra, at 10; Udall v. Tallman, 380 U.S. 1, at 16 (1965).

"In this case the EMRB concluded that the applicable standard to reconcile Sections 1 and 2 is that the government employer be required to negotiate if a particular item is found to *significantly* relate to wages, hours and working conditions even though that item is also related to management prerogative. The standard and the findings thereon are reasonable. Since NRS 288.110 gives the

board power to hear and *determine* any complaint arising out of the interpretation of the statute the board's conclusion was properly upheld by the trial court." 90 Nev. at 445-47. (Emphasis in original.)

The statutes of the two states are of course different; the Kansas act provides a more specific definition of conditions of employment, and K.S.A. 75-4330(*a*) clearly directs that the parties may reach a memorandum of agreement on all matters *relating* to conditions of employment, as long as those matters do not infringe upon employer or employee rights. The latter section clearly indicates that the list of conditions of employment is not to be read literally or exclusively; this, in turn, requires the reconciliation of the competing interests and the determination of which items are negotiable. This is precisely what PERB has done. It has statutory support for its actions. It has not exceeded its lawful power and authority, and it is not charged with being nor has it been fraudulent, arbitrary or capricious.

Other boards and other courts in other states have fashioned or approved similar tests when faced with the task of reconciling similarly inconsistent statutory provisions. See *Beloit Education Asso. v. WERC*, 73 Wis. 2d 43, 242 N.W.2d 231 (1976); *Unified S.D. No. 1 of Racine County v. WERC*, 81 Wis. 2d 89, 259 N.W.2d 724 (1977); *State v. State Supervisory Employees Association*, 78 N.J. 54, 393 A.2d 233 (1978); and Annot., Negotiable Issues in Public Employment, 84 A.L.R.3d 242, § 3[b]. We conclude that PERB's interpretation of the statute which it enforces is reasonable. The test which it has adopted and utilized in these proceedings is necessary to carry out the purposes of the Act; it is grounded in statute; and it is within the scope of the agency's authority.

## NEGOTIABILITY

The parties disagree as to the mandatory negotiability of certain specific items. A four-member majority of PERB found each of the items with which we are here concerned mandatorily negotiable; one member dissented. The majority ruling is contained within an eighteen-page order, in which PERB sets forth a full discussion of each of the specific items and the rationale for its ruling thereon. The district judge, after stating the appropriate rules of appellate review of administrative orders, determined that PERB's findings of fact were supported by substantial, competent evidence, and that its orders were lawful. The judge

then adopted the rulings, findings and conclusions of the board, and affirmed. We should note that PERB found one item and portions of others were not mandatorily negotiable. No appeal was taken from that portion of PERB's order.

A careful distinction should be made between this case and the teachers' contract negotiation cases such as *Chee-Craw Teachers Ass'n v. U.S.D. No. 247*, 225 Kan. 561, 593 P.2d 406 (1979). The teachers' contract negotiation cases were all actions filed directly in district court; the courts were thus called upon, in the first instance, to determine the mandatory negotiability of various topics under the applicable statute, the Kansas Professional Negotiations Act, K.S.A. 72-5413 *et seq.*, and to construe that act. The case now before us comes as an administrative appeal. A special board, created in 1971 by the Kansas Legislature for the purpose of administering the PEER Act, has heard evidence, reviewed the contentions of all parties, and has made its administrative determination of each issue which we are now called upon to review.

As noted earlier in this opinion, we must first determine whether the district court observed the requirements and restrictions placed upon it. We have determined that it did so in this case. We then make the same review of the administrative agency's action as does the district court. We may not substitute our judgment for that of the agency. Further, the legal interpretation of an administrative board, charged by the legislature with the authority to enforce or administer a statute, is entitled to a great deal of judicial deference. With these rules in mind, we now turn to PERB's specific findings with regard to mandatory negotiability. PERB's findings read in substance as follows:

"SALARY GENERATION

"The first subject before the Board is 'Salary Generation.' The language contained in this proposal clearly seeks to allow the employees input into the salary portions of the budget preparation process. The Board is guided in [its] determination of the negotiability of this subject by language contained at K.S.A. 75-4327(g) which states:

'(g) It is the intent of this act that employer-employee relations affecting the finances of a public employer shall be conducted at such times as will permit any resultant memorandum of agreement to be duly implemented in the budget preparation and adoption process.'

This provision, coupled with the specific inclusion of 'salaries' as a mandatory term and condition of employment, leaves the Board with no alternative but to find the subject of 'Salary Generation' to be mandatorily negotiable. There is

nothing sacred in the term 'Salary Generation.' This Board is of the opinion that the proposal placed on the table, and more especially section (A) (1) embodies exactly the process contemplated by the legislature when they listed 'salaries' as a mandatory subject of negotiations. . . .

## "SALARY ALLOCATION

"The second subject to be considered by the board is that of 'Salary Allocation.' As was the case in the previous subject, 'salaries' is listed as a mandatorily negotiable term and condition of employment. The language contained within the proposal on salary allocation again seeks to allow the organization input into the distribution of university salary monies to be received by bargaining unit members and others. . . . The Board does find discussions or proposals which seek to establish salaries of non-unit members to be other than mandatorily negotiable. *The salaries of non-unit members are management's prerogative and when the budget is submitted, those amounts would simply be added to the amount negotiated for unit members.* Salary allocation for members of bargaining unit is mandatory.

## "OUT OF STATE TRAVEL

"Out of state travel and the cost thereof have a definite significant relation to employee's ultimate compensation. Further, frequently out of state travel is necessary in the field of education in order for a teacher-employee to enhance his standing in the academic world which significantly relates to his salary. Out of state travel is mandatory.

## "PROMOTIONS

"The fourth subject deals with 'Promotions.' As stated at K.S.A. 75-4326, the right to determine that a promotion is in order is undeniably a management right. If and when management decides to promote, the action will have a significant relation to the terms and conditions of employment of the affected unit member(s), generally in regard to their salary and/or hours of work. . . . The portions of a promotion policy which would be subject to *mandatory negotiations would include the criteria, procedures, or methods by which candidates for promotion are identified* and the action is completed. [All other facets of the subject 'Promotions' were held not mandatorily negotiable, and no appeal is taken from that portion of the order.]

## "SUMMER EMPLOYMENT

"The employer must first decide if summer school classes are to be offered. Whether directed by the legislature, the statutes, or by his own whim, the employee organization certainly has no guaranteed right to participate in that decision. If and when the decision is made to conduct summer school classes, the employer must decide *which* classes will be offered. Curriculum is a matter reserved to management's decision. Complainant would have the Board find that a proposal defining the criteria, procedures, or methods for the screening of candidates for summer employment would in some way diminish management's right to establish curriculum. The Board submits that the cart is before the horse in that line of reasoning. As previously stated, the Board believes the employer has the undeniable right to establish curriculum to be offered. However, intrinsic to summer employment are all of the facets of conditions of employment. Therefore, it is a mandatory item.

## "TENURE

"The Sixth subject, 'Tenure,' like many of the other issues at hand, is not defined as a term and condition of employment within the statute. While tenure carries with it some sort of mystique on a university campus, the proposal before this Board seems to do nothing more than to establish a procedure whereby one can earn his way *out* of probation and *into* permanent status. . . . The Board directs the parties' attention to K.S.A. 75-4326(c) and (e) and specifically to the words 'for proper cause' and 'legitimate reasons.' The Board is convinced that those words were included by the legislature with the intent that a public employer be prevented from terminating employees at his whim. Logically, if the legislature recognizes the employer's right to terminate for proper cause, they would further expect someone other than the employer to review his own actions for validity. To find otherwise would render the terms 'proper cause' and 'legitimate reasons' of no value and useless for inclusion. The Board is of the further opinion that the legislature in no way intended that a discharged employee be required to file actions in the courts for determinations regarding proper cause. The reasonable assumption would be that the legislature intended for the employer and the employee organization to attempt to collectively formulate and agree on a method for the review of complaints arising from terminations. That avenue is, in the opinion of this Board, the grievance procedure, listed as a mandatorily negotiable subject at K.S.A. 75-4322(t). Inasmuch as a termination alters every condition of employment previously enjoyed by the employee, a person's ability or standing to request a review of the action becomes of paramount importance. If the individual attains that right at the moment in time when they acquire tenure, then negotiations over the earning of tenure are mandatory. *The duration of a probationary period understandably could vary depending on the nature of the employment* but most contracts of employment and/or civil service systems provide for a probationary period ranging from six (6) months to one year. Traditionally, the period allows the employer a fixed amount of time in which to 'evaluate' the employee and, if necessary, to discharge the employee without outside scrutiny. Successful completion of the period carries with it the expectation of continued employment if accomplished in accordance with the rules of the employer. The period of time one must serve in this state of 'limbo' until he is afforded the protections of the contract is undeniably mandatorily negotiable.

## "RETRENCHMENT

"Under K.S.A. 75-4326 the employer has the undeniable right to relieve employees from duties because of lack of work or for other legitimate reasons.

"An examination of the definition of 'conditions of employment,' as provided at K.S.A. 75-4322(t) reveals that 'salaries, wages and hours of work' are included. The issue of retrenchment currently before the Board is mandatorily negotiable in that any procedure for obtaining a reduction in the work force would significantly relate to salaries, wages or hours of work and other 'conditions of employment' as described by the definition.

"Perhaps the questions of the negotiability of retrenchment can most easily be understood and resolved by looking at the various procedures by which a reduction in work force may be achieved. One procedure that may be utilized by employers is to lay off employees one day per week. Certainly, this technique would fall under the definition for conditions of employment as it directly affects

the number of hours worked. Another procedure for achieving a reduction in work force is to simply terminate a certain number of employees. This technique would also fall under the definition of 'conditions of employment' as it directly affects the salaries of those employees. Still another procedure for effectuating retrenchment may involve a combination of lay off and demotions. This technique would also remain within the definition as it would, once again, involve the salaries of employees regardless of whether they are terminated or demoted.

"It should be noted that the Board is referring only to the *procedures* by which a reduction in work force is achieved as being mandatorily negotiable. The decision as to whether retrenchment is necessary is reserved for managerial discretion. The Board has reached this conclusion through an analysis of the management's rights provisions of K.S.A. 75-4326. These provisions allow for the maintenance of the work force through hiring, promoting, demoting, transfer, and so forth. In addition, an employer retains the right to assign work to employees. These rights only extend, in the opinion of the Board, to the actual decision as to whether retrenchment, promotion, transfer, etc., are necessary. The Board bases this conclusion on the portion of the declaration of policy at K.S.A. 75-4321(a)(3) which states:

" 'the state has a basic obligation to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government.'

"The Board is of the opinion that the designation of management rights, as set forth at K.S.A. 75-4326, is the avenue through which the state may fulfill its obligation to provide certain services. However, the Board believes that the legislature intended to limit the procedures by which these duties are fulfilled by the requirement of both public employers and public employees to meet and confer over conditions of employment.

"An examination of the language of the management's rights provisions at K.S.A. 75-4326 reveals that although the employer retains the right to decide whether lay off, promotion, etc., are necessary to fulfill governmental duties, the statute is silent concerning who may make the decisions on the *procedures* for promotion or reducing the work force. To determine who under the Act can set procedure, the Board has considered the mandatory nature of issues involving conditions of employment. The Board has shown that the procedures by which a reduction in work force is achieved has a direct impact on salaries and hours of work. In light of the fact that the legislature did not specifically grant the employer the right to set procedures for reducing the work force and in consideration of the direct impact of this procedure on the conditions of employment, the Board can only conclude that the procedure for achieving a reduction in work force is mandatorily negotiable.

### "PERSONNEL FILES

"The eighth subject is that of 'Personnel Files.' It is not difficult to understand the reasons why an employer might choose to keep files on his employees. Personnel files might contain letters of commendation, evaluations, records of disciplinary actions, payroll data, original applications, individual achievements, etc. Maintenance of a personnel file would be of no value or use unless it were maintained for some purpose. Personnel files are normally maintained by the employer and utilized in making various employment decisions relative to salary increases, promotions, terminations, awards, lay offs, vacation entitlement, re-

tirement eligibility, and many more. Since the material within the files serves to provide guidance in the determination of various conditions of employment, an employee's right to knowledge of the information in the file, and an avenue to refute erroneous entries is of monumental importance. The Board is therefore of the opinion that the subject of 'Personnel Files' *is mandatorily negotiable.*" (Emphasis added.)

We now turn to the specific items. Salary Generation and Salary Allocation—salary generation relates to providing members of the bargaining unit with input into the salary portions of the institution's budget during the budget preparation process; salary allocation refers to the distribution of salary money to unit members. These items are thus closely connected with salaries. The Act itself, as PERB noted, recognizes the subject of salaries and K.S.A. 1982 Supp. 75-4327(g) states the legislative intention that employee organizations have input before budget preparation. We agree with PERB that Salary Generation and Salary Allocation are mandatorily negotiable items.

Out of State Travel Funds—such funds are important to the teaching staff as the availability of travel money directly affects the opportunities for continuing professional training and education, which in turn directly relates to conditions of employment. Negotiation on this item should also precede the budgeting process. We agree that it is mandatorily negotiable.

Promotions—we agree with PERB that the right to determine that a promotion is in order is a management prerogative, reserved to management by K.S.A. 75-4326(b). The criteria, procedures, or methods by which candidates for promotion are identified, however, are items of immense interest to faculty, and not only have an effect upon salary but upon the motivation of the individual teaching employee. We agree with PERB that this limited portion of the Promotions item is mandatorily negotiable.

Summer Employment—PERB's order approving the negotiability of this subject is limited to the criteria, procedures, or methods for screening candidates for summer employment. This is directly related to salary, is a matter which is generally unique to the teaching faculty, and is a matter of considerable concern to those persons directly affected. It is mandatorily negotiable. The matters of determining whether summer sessions will be held, and of determining the courses to be offered, of course, remain nonnegotiable.

Tenure—the granting of tenure to the teaching staff members

in state institutions of higher learning is not directed by statute, as is the tenure of teachers in the public schools and community colleges. All that PERB's order holds to be negotiable under this item is the period of time that a faculty member must serve before he or she is considered for tenure. We agree that this is a proper subject for mandatory negotiations at the university level.

Retrenchment—The parties stipulated that "retrenchment" means "reduction in force and includes the method and procedures used for reduction of personnel, how personnel are to be laid off and establishment of procedures for recall of personnel." PERB held that the procedures by which a reduction in the work force is achieved is mandatorily negotiable. The decision as to whether a reduction is necessary is, of course, a management prerogative. We considered the issue of retrenchment with reference to public school teachers under the P N Act in *NEA-Parsons v. U.S.D. No. 503,* 225 Kan. 581, 593 P.2d 414 (1979), and we held that it was not mandatorily negotiable. We based that decision, however, upon management prerogative and upon factors which are not here present. Quoting the trial judge, we said:

" '[T]he individual teacher's job security, whether the teacher is a member of the teachers' association or not, is already protected by statute under the Continuing Contract Law and the Due Process Procedure on Contract Termination. Strict limitations are placed on the school board by these statutes, and *such matters as have been fixed by statute may not be adjusted or changed by the parties.'* " 225 Kan. at 586. (Emphasis in original.)

The cited statutes are, of course, inapplicable here and afford no protection to the university teaching staff. Further, the teaching and research personnel in the institutions of higher learning governed by the Regents are in the unclassified civil service, and do not have the protections given by statute to those persons in the classified civil service relating to tenure, layoffs due to shortage of work, dismissals, demotions and suspensions. See K.S.A. 1982 Supp. 75-2935(*f*), -2946, -2948 and -2949. Members of the teaching faculty at Pittsburg State University are appointed by the president of that institution and serve at his pleasure, subject to policies approved by the Regents. K.S.A. 76-715.

We note also that retrenchment has been a subject of some difficulty at the University. The president, on several occasions, approached the PSU Faculty Senate, an elected representative

body of the teaching faculty, and sought that body's help in formulating retrenchment policies. The senate and the faculty as a whole passed resolutions indicating that they wished KNEA to represent their interests in formulating such a policy. Nevertheless, the president implemented a faculty election procedure to produce a committee, ultimately appointed by him from an elected pool, to establish retrenchment procedures. A KNEA proposal on retrenchment was "on the table" at that time. Retrenchment was expressly mentioned in the two negotiated agreements at Pittsburg State University, and retrenchment has been included in numerous other negotiated agreements approved by the Regents. The Supreme Court of Wisconsin, employing a test similar to that employed by PERB, has found that *the procedures* by which a reduction in staff is effected, rather than *the decision* to effect a reduction, is mandatorily negotiable. *Beloit Education Asso. v. WERC,* 73 Wis. 2d 43, 242 N.W.2d 231 (1976). Other courts have arrived at the same conclusion. See Annot., 84 A.L.R.3d 242, § 20, pp. 292-93.

We conclude that PERB's decision that retrenchment procedures are significantly related to conditions of employment and are mandatorily negotiable is reasonable under the Act. We agree with that determination.

Personnel Files—the right of a public employee to review his or her personnel file, upon which many management decisions of great import to the employee may be based, is an appropriate subject for mandatory negotiations. We agree with PERB's discussion and conclusion on this issue.

We have carefully considered all the issues raised in this appeal and find no error.

The judgment is affirmed.

SCHROEDER, C.J., dissenting and concurring: I must respectfully dissent from Syllabi 6, 7, and 8, and the corresponding portions of the opinion written for the court.

This appeal presents a case of first impression on the construction of the Kansas Public Employer-Employee Relations Act, K.S.A. 75-4321 *et seq.* (PEER Act). However, both the trial court and this court on appeal have abdicated their responsibility to analyze the accuracy of the Public Employee Relations Board's (PERB) construction of the PEER Act and deferred the

matter to PERB, an administrative agency in the Executive Branch of government.

While the law presumes that administrative agencies develop expertise in resolving factual disputes in the area of their assigned responsibility, it does not credit such agencies with any particular expertise in giving proper interpretation to the legislative will behind a statutory enactment. "The final word on interpretation of law and its applicability, whether constitutional or statutory, resides in the courts, which may substitute their judgment on questions of law for that of the agency on a virtually *carte blanche* basis." 5 Mezines, Stein, Gruff, Administrative Law § 51.01, p. 51-2 (1983).

The Constitution of Kansas, art. 3, § 1, provides in part: "The judicial power of this state shall be vested *exclusively* in one court of justice, which shall be divided into one supreme court, district courts, and such other courts as are provided by law." (Emphasis added.)

"In reviewing questions of law, the trial court may substitute its judgment for that of the agency, although ordinarily the court will give deference to the agency's interpretation of the law." *Richardson v. St. Mary Hospital,* 6 Kan. App. 2d 238, 242, 627 P.2d 1143, *rev. denied* 229 Kan. 671 (1981). See *Southwestern Bell Telephone Co. v. Employment Security Board of Review,* 189 Kan. 600, 371 P.2d 134 (1962).

In *Rydd v. State Board of Health,* 202 Kan. 721, 728-29, 451 P.2d 239 (1969), the Supreme Court was confronted with the review of action taken by an administrative agency and said:

"It is true the appeal statute here ([K.S.A.] 65-504) provides for trial *de novo;* however, as in [*Kansas State Board of Healing Arts v. Foote,* 200 Kan. 447, 436 P.2d 828], the statute is to be construed in the light of the constitutional inhibition prescribed by the separation of powers doctrine. This means the legislature may not impose upon the judiciary the function of a trial *de novo* of action of an administrative agency in the sense of authorizing the court to substitute its judgment for that of the administrative agency in matters *other than law or essentially judicial matters.*

"65-504 authorizes the court to act if it finds the board's order arbitrary, unlawful or unreasonable. The issue, then, before the district court upon appeal is the reasonableness and *legality of the order appealed from.* Upon that issue the trial is *de novo,* but that does not mean the district court is at liberty to make an independent finding on the right to a license. Hearing before a district court upon appeal is thus not the equivalent of the initial hearing before the licensing agency which has the responsibility of weighing controverted evidence and arriving at an independent judgment, on the merits, as to entitlement to a license." (Emphasis added.)

The record here does not present factual disputes. In the words of PERB's hearing examiner for Cases 20 and 21:

"There appears to be little disagreement of factual matters surrounding the meet-and-confer sessions. Rather, respondent argues that the preceding memorandum of agreement dictated the parties' rights and obligations for meeting and conferring during the life of the existing agreement."

Case 75-CAEO-1-1982, by agreement of the parties, was submitted entirely on the briefs addressing the negotiability of KNEA's proposals.

The standard of review applied by the trial court as it appears in the record reads:

"There is no issue that this is an appeal from an administrative board and therefore this Court may not substitute its judgment for that of the Board and that the Court's determination must be limited to whether the findings of the Board were arbitrary, capricious or unlawful."

How the district court applied the traditional test stated in *Kansas State Board of Healing Arts v. Foote,* 200 Kan. 447, 436 P.2d 828 (1968); and *Behrmann v. Public Employees Relations Board,* 225 Kan. 435, 591 P.2d 173 (1979), is not clear. Whether PERB acted fraudulently, arbitrarily or capriciously was not an issue in these cases.

That the Supreme Court has abdicated its responsibility to construe the PEER Act, as did the trial court, is clearly indicated by its attempt to distinguish *Chee-Craw Teachers Ass'n v. U.S.D. No. 247,* 225 Kan. 561, 593 P.2d 406 (1979), and similar cases, on the ground that the teachers' contract cases were all actions filed directly in the district court, while "[t]he case now before [the court] comes as an administrative appeal." 233 Kan. at 822. In construing the PEER Act as a matter of law the Supreme Court in this case should make no distinction between these cases. The constitutional responsibility of the Supreme Court to interpret the law in each situation is identical.

PERB's legal analysis of the PEER Act is so far afield in these cases that a real need exists for a correct and sensible interpretation and application of the PEER Act. This court should now correct PERB's improper legal analysis of the PEER Act which is squarely here for construction.

Abuse of regulatory authority, even in the context of factual determinations, has been consistently curbed and corrected by judicial intervention, lest administrative agencies become the

uncontrolled and uncontrollable fourth branch of government. *Missouri Pacific Rld. Co. v. State Corporation Commission,* 205 Kan. 610, 625, 470 P.2d 767 (1970). See also *Missouri Pacific Rld. Co. v. State Corporation Commission,* 192 Kan. 575, 389 P.2d 813 (1964).

The majority opinion sanctions the use of the "significantly related" test by PERB in determining what is or is not negotiable between public employers and employees under the Kansas Public Employer-Employee Relations Act, K.S.A. 75-4321 *et seq.,* although there is little in the Act itself or the history of the Act to suggest the legislature intended or envisioned that such a test be utilized. The definition of "conditions of employment" included in the Act evidences a legislative intent to specify those areas which are mandatorily negotiable and dictates that the Act be so construed. In construing this intent the court should look to the history of the Act as well as the parallel history of the Professional Negotiations Act, K.S.A. 72-5413 *et seq.* (P N Act). While the majority opinion attempts to discredit the applicability of the legislative history of the P N Act in construing the PEER Act, it cannot be overlooked that both acts involve employee-employer negotiations, although the PEER Act applies to a much broader group of employees. Also, the two acts use strikingly similar terminology in outlining the procedures for and scope of negotiations, the prime example being "terms and conditions of professional service" in the P N Act and "conditions of employment" in the PEER Act. It is often recognized that other statutes dealing with the same subject as the one being construed comprise a form of extrinsic aid deemed relevant as a source from which conclusions as to how the statute should be interpreted and applied can be drawn. 2A Sutherland, Statutory Construction § 50.01 (4th ed. 1973).

The majority opinion sets forth the pertinent legislative history of the two acts. At the time the P N Act was amended in 1977 to add a definition of "terms and conditions of professional service" which enumerated mandatory subjects of negotiation and incorporated the "impact" test from the court's decision in *National Education Association v. Board of Education,* 212 Kan. 741, 512 P.2d 426 (1973) *(Shawnee Mission),* the PEER Act was amended to add "prepaid legal service benefits" to the laundry list of subjects enumerated in the definition of conditions of employ-

ment in K.S.A. 75-4322(*t*). Based on this the majority opinion rejects the appellants' challenge to PERB's use of the "significantly related" test, concluding:

"Doubtless [PERB] has faced prior challenges as to what is or is not negotiable between public employers and public employee representatives, and has resolved such challenges by using the 'significantly related' test. If the legislature in 1977 had desired to curtail the use of such a test, or to have made clearer the restrictions on negotiability urged by appellants, it could have done so."

This statement implies the legislature should have expressly stated in the Act that only those items in 75-4322(*t*) were mandatorily negotiable, similar to that done in the 1980 amendment to the P N Act where the "impact" test included in 1977 was expressly rejected. It cannot be assumed the legislature has been made aware of the interpretation given to the Act by PERB. The failure of the legislature to amend the Act to restrict the use of the "significantly related" test in determining which subjects are mandatorily negotiable is of little significance where there is no evidence indicating the agency's interpretation was brought to the attention of the legislature. See 2A Sutherland, Statutory Construction § 49.10 (4th ed. 1973).

Had the legislature intended or envisioned that a balancing or "significantly related" test would be utilized by PERB in determining which subjects are or are not negotiable, there would have been no purpose for the inclusion of the detailed list of negotiable conditions of employment in the statute, nor the 1977 amendment adding to that list. It would have been sufficient for the legislature to have merely used the undefined term "conditions of employment" as it did in 1970 when it enacted the P N Act. The use of such a broad term necessarily would have indicated legislative intent that the term be construed by courts or boards in determining which items were or were not negotiable on a case-by-case basis. Conversely, however, a detailed definition of the term "conditions of employment" designating those items intended by the legislature to be negotiable under the Act leaves no room for judicial construction expanding the areas of negotiability beyond those subjects specifically enumerated in the Act.

The decision reached by the majority, that the statutory definition of conditions of employment in K.S.A. 75-4322(*t*) does not contain the exclusive list of mandatorily negotiable subjects, is

based largely upon the phrase "relating to conditions of employment" which is found in two places in the Act. K.S.A. 75-4321(b) provides that the purpose of the Act is to obligate public agencies and their employees to enter into discussions to resolve grievances and disputes "relating to conditions of employment." K.S.A. 75-4330 provides in part:

"(a) The scope of a memorandum of agreement may extend to all matters *relating to conditions of employment*, except proposals relating to . . . (3) public employer rights defined in K.S.A. 75-4326 . . . ." (Emphasis added.)

The majority isolates the phrase "relating to conditions of employment" contained in those sections and extrapolates from that a legislative intent that the subjects enumerated in 75-4322(t), defining "conditions of employment," was meant to be merely illustrative, rather than exclusive. However, a reading of the Act as a whole does not lend itself to this interpretation. The phrase "conditions of employment" is used several times elsewhere in the Act, and in particular in K.S.A. 1982 Supp. 75-4327(b) and K.S.A. 75-4322(m). 75-4327(b) provides that the appropriate employer *shall* meet and confer in good faith with the public employee association "in the determination *of conditions of employment* of the public employees as provided in this act, and *may* enter into a memorandum of agreement with such recognized employee organization." (Emphasis added.) K.S.A. 75-4322(m) defines "[m]eet and confer in good faith" as:

"[T]he process whereby the representative of a public agency and representatives of recognized employee organizations have the mutual obligation personally to meet and confer in order to exchange freely information, opinions and proposals to endeavor to reach agreement *on conditions of employment*." (Emphasis added.)

The more reasonable construction of the Act is that the legislature intended only for those items delineated in 75-4322(t) to be conditions of employment which are mandatorily negotiable between the public employee and employer. Under 75-4330 other subjects relating to conditions of employment are permissibly negotiable between the employee and employer, if they should agree to enter into negotiations in those areas, and may be included in a memorandum of agreement. Subjects enumerated in 75-4326, however, are reserved to the exclusive control of the public employer, which cannot abdicate its management and

control responsibilities by entering into negotiations and agreement on these subjects.

There is no language contained in the Act from which either this court or PERB can extrapolate a legislative intent to apply a "significantly related" test to determine that subjects other than those enumerated in 75-4322(*t*) are mandatorily negotiable. The Act states that the employer and employee shall meet and confer "in the determination *of conditions of employment.*" K.S.A. 75-4322(*t*) defines specifically and exclusively what these conditions of employment are. The Act further provides that the employer and employee may negotiate and enter into a memorandum of agreement on other subjects relating to conditions of employment, should they choose to do so. The parties cannot, however, agree to negotiate on subjects expressly reserved for management control and discretion in 75-4326.

This interpretation does not in any way nullify the operation and purpose of the Act, as the majority opinion suggests. The declaration of legislative intention in 75-4326 to not abrogate existing rights of management in certain areas does not alter the mandatory negotiability of the subjects listed in 75-4322(*t*). It also does not infer that the legislature intended those areas of management control were to be balanced against the enumerated conditions of employment in 75-4322(*t*) by PERB to determine which subjects are negotiable under the Act. At most the provision serves to clearly express the legislative intent to preserve certain designated areas for exclusive management control and limit the area of permissive negotiations under 75-4330.

It is the responsibility of this court to discern the intent of the legislature from the enacted legislation and construe the statutes accordingly. The majority opinion abdicates this court's responsibility by deferring to PERB the interpretation of these statutes on this matter of law. The proposition cannot be seriously entertained that the legislature intended for PERB to have a free hand in construing the provisions of this Act. This is the first time the Act has come before the court for interpretation. By enacting 75-4322(*t*) the legislature clearly designated an area which was appropriate for public employee-employer negotiations. It is impossible to discern a legislative intent that the subjects of mandatory negotiation under the Act extend beyond those specifically enumerated in the definition of conditions of employment in 75-4322(*t*). If there is any such purpose it should be

legislatively expressed in clear and distinct language in the statute.

It is also noteworthy that the "significantly related" test applied by PERB has been criticized by others because of its *inherent bias* toward mandatory negotiability.

"This standard ['significant relation' standard] is inadequate because it does not properly recognize the competing interests at stake where there is an overlap between conditions of employment on the one hand and management prerogatives on the other. By focusing on only one-half of the overlap problem, this standard gives undue weight to conditions of employment." Clark, *The Scope of the Duty to Bargain in Public Employment,* in Labor Relations Law in the Public Sector 81, 92 (Knapp. ed. 1977).

A balancing test, as used by this court in the *Shawnee Mission* case, is the proper test to apply in resolving case-by-case determinations of negotiability because it does not begin with a bias. See Clark, pp. 92-95; *CMU Faculty v. CMU,* 404 Mich. 268, 291-93, 273 N.W.2d 21 (1978) (Coleman, J., dissenting).

The inherent bias in PERB's "significant relation" test toward negotiability cannot be better illustrated than by the subject of retrenchment involved in the present case. In applying the *Shawnee Mission* "impact" test in *NEA-Parsons v. U.S.D. No. 503,* 225 Kan. 581, 586, 593 P.2d 414 (1979), this court held retrenchment was not a mandatorily negotiable subject because it would have a serious effect on basic policy decisions of the school board. Using the "significant relation" test, however, PERB finds that retrenchment significantly relates to salaries, wages or hours of work and other "conditions of employment" and is thus mandatorily negotiable. This finding was made by PERB even though this court interpreted essentially the same phrase—"terms and conditions of professional service"—otherwise in *NEA-Parsons.*

In support of its decision the majority opinion points to cases from other states which have approved the use of tests similar to the "significantly related" test in determining which subjects are mandatorily negotiable under various state public employee relations acts. *In all those cases, however, the statutes involved are significantly different from the Kansas Act.* None of those statutes set forth a long and detailed list of negotiable items in defining what constitutes conditions of employment as the Kansas Act does. It is only logical to assume that where a legislature chooses not to define what constitutes terms and conditions of

employment it intends to encompass a broad range of topics which should be construed accordingly by the judiciary on a case-by-case basis to accommodate the various needs of the parties involved. It has been recognized, however, that a legislative intent to limit negotiable subjects is evidenced where a list of specific subjects which are negotiable is set forth in a statute which restricts the court's authority to determine on a case-by-case basis what are conditions of employment within the meaning of the relevant statute. See *West Hartford Education Assn., Inc. v. DeCourcy*, 162 Conn. 566, 581-82, 295 A.2d 526 (1972); *Dunellen Bd. of Ed. v. Dunellen Ed. Assn.*, 64 N.J. 17, 31, 311 A.2d 737 (1973).

There is a further reason for the above-controlled construction and application of the Act in this case. As recognized in the majority opinion the Act broadly applies to the entire spectrum of state employees, from professionals to manual laborers. In its application to employment negotiations between the Kansas Board of Regents and employees of state colleges and universities, however, the Act *must be construed in light of constitutional and statutory provisions authorizing the Board of Regents to control and supervise the state colleges and universities.*

Art. 6, § 2, of the Kansas Constitution explicitly mandates that the legislature provide *for the control and supervision of public institutions of higher learning by the Board of Regents.* In fulfillment of this mandate, K.S.A. 76-712 provides:

"The state educational institutions are state agencies and state institutions and shall be controlled by, and operated and managed under the supervision of the board of regents. For such control, operation, management or supervision, the board of regents may make contracts and adopt orders, policies or rules and regulations and do or perform such other acts as are authorized by law or are appropriate for such purposes."

While the majority opinion recognizes these constitutional and statutory provisions in discussing the public employer issue, *it ignores these directives* when considering the subjects which are mandatorily negotiable under the Act. The Act itself provides that the scope of negotiations are limited by statutes and constitutional provisions which govern in some matters. K.S.A. 75-4322(*t*), following the enumerated list of conditions of employment, provides that *"nothing in this act shall authorize the adjustment or change of such matters which have been fixed by statute or by the constitution of this state."* (Emphasis added.)

The format of the PEER Act presents difficulty in application to public institutions of higher education such as this, where other statutory and constitutional provisions determine the scope of control and supervision by the employer. The prerogatives and autonomy of the Board of Regents to control and supervise institutions of higher education in this state must be recognized and given effect in determining the scope of negotiations under this Act. The Act itself makes it clear that its terms are not to be viewed so expansively as to negate the Board's overall supervisory responsibilities as set forth in ·Art. 6, § 2, of the Kansas Constitution and K.S.A. 76-711 *et seq.* (K.S.A. 75-4322[*t*].) For other cases limiting the scope of negotiations under similar provisions see Annot., 84 A.L.R.3d 242 § 5[b].

It is respectfully submitted the judgment of the lower court should be reversed, and on the posture of these cases here for review, the Supreme Court should assert its mandatory obligation to construe the PEER Act.

McFARLAND, J.: I join in the concurring and dissenting opinion of Schroeder, C.J. I believe, however, some additional comments are appropriate.

The Public Employer-Employee Relations Act (K.S.A. 75-4321 *et seq.*) was Senate Bill 333 enacted in 1971, to become effective March 1, 1972. "A Comparison of SB333, Sen. Sub. HB1573 of 1970, and The ACIR Bill on Public Employer-Employee Relations" prepared by legislative staff personnel for consideration of Senate Bill 333, provides in pertinent part:

"SB333 is based on the Senate Substitute to HB1573, as amended on third reading and passed by the senate in 1970. Sen. Sub. HB1573, in turn, was based on a preliminary draft of a bill prepared by the U.S. Advisory Commission on Intergovernmental Relations. For the Commission report, adopted September, 1969 but later printed, see 'Labor-Management Policies for State and Local Government,' A-35, 263 pages. The finally drafted bill is included in ACIR's report, 'New Proposals for 1971—ACIR State Legislative Program,' November, 1970.

"Following is comparison of the three proposals. References to HB1573 refers to 'Sen. Sub. HB1573 Am. SCW.' Reference to ACIR refers to the ACIR 'meet and confer' bill in the publication noted above. This comparison is supplemental to the summary to SB333, attached.

"*Generally, the provisions of SB333 are substantially identical to HB1573 and the ACIR proposed bill except as noted below.*

. . . . .

"(s) *defines 'conditions of employment'; HB1573 and ACIR would permit employment relations as to 'wages, hours, and other terms and conditions of employment' without defining these terms.* (Emphasis supplied.)

The legislative staff summary referred to above, states in pertinent part:

"*Section 6 specifies certain traditional public employer rights under the act. This key section prevents modification of such employer rights as to 'determine the methods, means and personnel by which operations are to be carried on.'* " (Emphasis supplied.)

Thus we see the PEER Act as enacted was modelled after the 1970 HB 1573 which in turn was modelled after the ACIR proposed bill with certain significant changes. Rather than define *conditions of employment* by the open-ended phrase "wages, hours, *and other terms and conditions of employment*," the legislature chose the closed-in precise definition set forth in K.S.A. 75-4322(*t*) as follows:

" 'Conditions of employment' means salaries, wages, hours of work, vacation allowances, sick and injury leave, number of holidays, retirement benefits, insurance benefits, prepaid legal service benefits [added in 1977], wearing apparel, premium pay for overtime, shift differential pay, jury duty and grievance procedures, but nothing in this act shall authorize the adjustment or change of such matters which have been fixed by statute or by the constitution of this state."

The 1971 legislature again departed from its model for the legislation by specifically providing in K.S.A. 75-4326:

"Nothing in this act is intended to circumscribe or modify the existing right of a public employer to:
"(*a*) Direct the work of its employees;
"(*b*) Hire, promote, demote, transfer, assign and retain employees in positions within the public agency;
"(*c*) Suspend or discharge employees for proper cause;
"(*d*) Maintain the efficiency of governmental operation;
"(*e*) Relieve employees from duties because of lack of work or for other legitimate reasons;
"(*f*) Take actions as may be necessary to carry out the mission of the agency in emergencies; and
"(*g*) Determine the methods, means and personnel by which operations are to be carried on." (Emphasis supplied.)

K.S.A. 75-4330(*a*) provides in relevant part:

"The scope of a memorandum of agreement may extend to all matters relating to conditions of employment, except proposals relating to (1) any subject preempted by federal or state law or by a municipal ordinance passed under the provisions of

section 5 of article 12 of the Kansas constitution, (2) public employee rights defined in K.S.A. 75-4324, (3) *public employer rights defined in K.S.A. 75-4326,* or (4) the authority and power of any civil service commission, personnel board, personnel agency or its agents established by statute, ordinance or special act to conduct and grade merit examinations and to rate candidates in the order of their relative excellence, from which appointments or promotions may be made to positions in the competitive division of the classified service of the public employer served by such civil service commission or personnel board. Any memorandum of agreement relating to conditions of employment entered into may be executed for a maximum period of three (3) years, notwithstanding the provisions of the cash basis law as contained in K.S.A. 10-1102 *et seq.* and the budget law as contained in K.S.A. 79-2925 *et seq.*" (Emphasis supplied.)

Numerous representatives of public employers and labor organizations testified before the appropriate legislative committees relative to SB 333. E. A. Mosher, Executive Director, League of Kansas Municipalities, testified *inter alia:*

"*In summary, we think SB333 is a good bill. It reasonably balances both the employer and employee interests. We would write it differently if we had the option . . . and I know union representatives would write it differently too. But it is a comprehensive bill, to which changes can be made in the future as the need arises.* Perhaps most important, we think it preserves and protects the public interest which is the only reason why government exists. We urge its favorable consideration, this session." (Emphasis supplied.)

SB 333 was a compromise bill which appears from the legislative history to have had, at least as to sections we are involved with, the support of both labor organizations and the public employers. The legislature, as noted by Mr. Mosher, *struck a balance* between the competing interests. I believe there is no room in the PEER Act for administration or judicial redetermination of that balance. Yet that is precisely what the PERB decision, as affirmed by the majority of this court, has done by adoption of the "balancing test." Such a test would have been appropriate had the original version of the bill been enacted which permitted negotiations on the undefined terms "wages, hours, and other terms and conditions of employment" and did not reserve to the public employees a precise list of traditional public employee rights.

As noted in the majority opinion, the Professional Negotiations Act (K.S.A. 72-5413 *et seq.*) relative to public school teachers as originally enacted in 1970 required negotiation of "terms and conditions of professional service" without providing a definition of the term. In *National Education Association v. Board of*

*Education,* 212 Kan. 741, 512 P.2d 426 (1973) (commonly referred to as *Shawnee Mission*) this court, of necessity, established a balancing test (impact) in order to make the general undefined term workable. In *NEA-Topeka, Inc. v. U.S.D. No. 501,* 225 Kan. 445, 592 P.2d 93 (1979), the history of the Professional Negotiations Act up to the subsequent amendments is set forth in detail. In summary, after the *Shawnee Mission* case the 1977 legislature defined terms and conditions of professional service as follows in K.S.A. 72-5413:

" '(1) "Terms and conditions of professional service" means salaries and wages, hours and amounts of work, vacation allowance, holiday, sick and other leave, number of holidays, retirement, insurance benefits, wearing apparel, pay for overtime, jury duty, grievance procedure, disciplinary procedure, resignations, termination of contracts, matters which have a greater direct impact on the well-being of the individual professional employee than on the operation of the school system in the school district or of the community junior college and such other matters as the parties mutually agree upon as properly related to professional service. Nothing in this act, or the act of which this section is amendatory, shall authorize the adjustment or change of such matters which have been fixed by statute or by the constitution of this state.' " 225 Kan. at 449.

As noted in *NEA-Topeka, Inc. v. U.S.D. No. 501,* this amendment in essence made statutory law out of the judicial determination in *Shawnee Mission,* retaining the impact test as an additional item of negotiation.

In 1979 litigation on the Professional Negotiations Act occupied a substantial portion of this court's calendar. Teachers' organizations and school boards across the state were not negotiating, they were litigating what was or was not mandatorily negotiable under the "impact test." Neither the teachers' organizations nor the school boards were satisfied with the state of affairs. In 1980 modifications of the existing law were sought by both sides. Extensive testimony was heard by the appropriate legislative committees. Illustrative thereof are the following excerpts:

Executive Director of NEA of Shawnee Mission:

"As you are all aware, the Supreme Court of this state handed down several decisions last year which have the potential for altering meaningful negotiations conducted to date in districts throughout the state. I state that these decisions have the potential for altering because, despite the fact that we think the Court has in fact altered the law as passed by this legislature in 1977, the Court rulings still provide that in most areas of contract negotiations, the parties were left with permission to negotiate.  .  .  .

". . . First, we would ask that the legislature amend the Negotiations Act to include a scope of bargaining which would encompass all of the areas negotiated in contracts prior to the Supreme Court ruling as mandatory subjects for negotiations."

## Kansas NEA:

"K-NEA believes Senate Bill 539 is deficient in two critical areas—scope of negotiations and impasse resolution. The law, as enacted in 1970, defined scope as 'terms and conditions of profession[al] service.' There were problems in determining scope in some USD's, but those decisions were jointly arrived at and the agreements were beginning to reflect the parties' thinking on what properly should be included in the collective agreement.

"The 1977 Legislature incorporated a listing of negotiable subjects. K-NEA lobbied to retain the broader 'terms and conditions of professional service.' Subsequently the state supreme court made an extensive series of rulings which we believe run counter to the express language of the law and the intent of the Legislature when it spoke to the issue in 1970 and 1977.

"We ask that you amend Senate Bill 539 to include the language set forth in the attached balloon of Section 1 (1). Our proposal will restore the definition to its breadth prior to the court decisions and build in supplemental contracts, which, because of the supplemental contract law, are not covered by the negotiation law."

## Lee Quisenberry of K-NEA:

"*The so-called 'impact' test, shown as a deletion on lines 125-129, is proposed for elimination, and that elimination is agreeable to KNEA if the topics gained through that test thus far are included.* These topics are shown on lines 129-142, and include all topics previously held to be negotiable by the Supreme Court as a result of the 'impact' test except one—in-service training."

## M. A. McGhehey, Executive Director Kansas Association of School Boards:

"4. *Impact test.* When the impact test was amended out of the bill, the first three lines on p. 4 were not removed, and if the impact test is left out, these three lines have no meaning and should also be deleted.

. . . .

"6. *Another impact test.* The amendment to lines 143 through 153 establish another impact test. We recommend deletion of the amendment, and the restoration of the present language of the law. It is a vague and ambiguous provision that will spawn litigation without end, permitting negotiation of statutes and the constitution itself.

. . . .

"*The impact test was removed because of the belief that it was one of the principal causes of litigation.* When the Kansas Supreme Court was hearing one of the early negotiations cases, Chief Justice Schroeder asked the question of the attorneys involved as to whether they regarded the negotiations law as the lawyers' full employment statute. There was a faint smile on both the lawyers' faces and no disclaimer. *To whatever extent the legislature can limit the extent*

*of litigation will  .  .  .   certainly be beneficial to the public interest."* (Emphasis supplied.)

The 1980 legislature heard the testimony and, in balancing the respective interests, expanded the list of mandatorily negotiable items but deleted the impact test. (K.S.A. 72-5413[*l*].) There have been no more cases before the court on the scope of professional negotiation. Presumably the teachers' organizations and the school boards are now accomplishing the purposes of the act—negotiation rather than litigation on what topics are mandatorily negotiable.

It is indeed ironic that after the balancing test concept has been tried and repudiated by the legislature in public school teacher negotiations, it has, like the legendary phoenix, arisen from its ashes and been engrafted onto the Public Employer-Employee Relations Act by PERB with the blessing of the majority of this court. The possibility of endless crippling litigation from utilization of the balancing test in PEER negotiations is far greater than in the Professional Negotiations Act. Public school teachers are a relatively homogeneous group as far as their jobs are concerned. PEER covers a vast spectrum of jobs—including university teachers, prison guards, food service workers, road maintenance crews and health care workers. The majority opinion states:

"For example, salaries, wages, hours of work, retirement benefits, insurance benefits and grievance procedures are not single-faceted categories, with only one commonly accepted and easily understood component. The subjects are, in fact, multifaceted and depend for their specifics upon the particular type of employment involved."

Under this rationale an item declared mandatorily negotiable in litigation involving university faculty might not be mandatorily negotiable in litigation involving firemen. Presumably the balancing test must be applied separately to each claimed item in each job category. Litigation on a particular item resolves the issue only as to the particular group of employees involved.

I turn now to another area of concern. For convenience, K.S.A. 75-4322(*t*) and 75-4326 are repeated as follows:

"(*t*) 'Conditions of employment' means salaries, wages, hours of work, vacation allowances, sick and injury leave, number of holidays, retirement benefits, insurance benefits, prepaid legal service benefits [added in 1977], wearing apparel, premium pay for overtime, shift differential pay, jury duty and grievance procedures, but nothing in this act shall authorize the adjustment or change of

such matters which have been fixed by statute or by the constitution of this state."

## K.S.A. 75-4326:

"Nothing in this act is intended to circumscribe or modify the existing right of a public employer to:

"(a) Direct the work of its employees;

"(b) Hire, promote, demote, transfer, assign and retain employees in positions within the public agency;

"(c) Suspend or discharge employees for proper cause;

"(d) Maintain the efficiency of governmental operation;

"(e) Relieve employees from duties because of lack of work or for other legitimate reasons;

"(f) Take actions as may be necessary to carry out the mission of the agency in emergencies; and

"(g) Determine the methods, means and personnel by which operations are to be carried on."

Each item in K.S.A. 75-4322 relates directly to the fundamental nuts and bolts of a public employee's job. Wholly absent from the list are items relating to how the job is obtained, training, promotions, layoffs, firing, transfers and how or what work is to be performed. K.S.A. 75-4326 reserves these areas to the public employers. This is the balance struck by the legislature. There is a logical reason for this. The act applies uniformly to "public employees," defined by K.S.A. 75-4322(a) as follows:

" 'Public employee' means any person employed by any public agency, except those persons classed as supervisory employees, professional employees of school districts, as defined by subsection (c) of K.S.A. 72-5413, elected and management officials, and confidential employees."

Obviously many more individuals than employees of the State of Kansas are involved. As for state employees, over half of all state employees, excluding college students employed by the state at universities, are classified employees as that term is defined by the Civil Service Act (K.S.A. 75-2925 *et seq.*). The purpose of the act is set forth in K.S.A. 1982 Supp. 75-2925 as follows:

"The general purpose of this act is to establish a system of personnel administration that meets the social, economic and program needs of the people of the state of Kansas as these needs now or in the future may be established. This system shall provide means to recruit, select, develop and maintain an effective and responsible work force and shall include policies and procedures for employee hiring and advancement, training and career development, job classification, salary administration, retirement, fringe benefits, discipline, discharge and

other related activities. All personnel administration actions regarding employees in the state classified service shall be made without regard to race, national origin or ancestry, religion, political affiliation, or other non-merit factors, and shall not be based on sex, age or physical disability except where sex, age or physical requirements constitute a bona fide occupational qualification necessary to proper and efficient administration. Personnel administration actions shall be based on merit and fitness to perform the work required and shall provide fair and equal opportunity for public service."

The Civil Service Act details all aspects of hiring, layoffs, dismissals, demotions, promotions, transfers, leaves of absence, etc. Particularly illuminating for our purposes is K.S.A. 1982 Supp. 75-2935(2) as follows:

"(2) The classified service comprises all positions now existing or hereafter created which are not included in the unclassified service. Appointments in the classified service shall be made according to merit and fitness from eligible lists prepared upon the basis of examination which so far as practicable shall be competitive. *No person shall be appointed, promoted, reduced or discharged as an officer, clerk, employee or laborer in the classified service in any manner or by any means other than those prescribed in the Kansas civil service act and the rules adopted in accordance therewith.*" (Emphasis supplied.)

The university faculty herein are designated as a part of the unclassified service (K.S.A. 1982 Supp. 75-2935[1][f]). Nevertheless the PEER Act applied uniformly to all organizations representing state employees—whether said employees be classified or unclassified. Does the majority intend to apply its beloved balancing test where classified employees are concerned and thereby let PERB override the Civil Service Board which is statutorily charged with complete control in its field? Or does the majority intend to discriminate against the classified employees by limiting its balancing test to unclassified employees? These are interesting questions which serve to point out the fallacy of the majority's position.

Some reference must be made to another portion of the rationale utilized by the majority to shore up its adoption of the balancing test. The majority states:

"PERB has been an active state agency since its creation by the legislature in 1971. Doubtless it has faced prior challenges as to what is or is not negotiable between public employers and public employee representatives, and has resolved such challenges by using the 'significantly related' test. If the legislature in 1977 had desired to curtail the use of such a test, or to have made clearer the restrictions on negotiability urged by appellants, it could have done so."

There is nothing in the record to indicate whether or not the

balancing test has been previously utilized by PERB, let alone whether the legislature was cognizant of such usage. There have been no Kansas appellate cases wherein PERB's utilization of the balancing test was at issue or even mentioned. The majority apparently believes that a first-time challenge to a 13-year-old statute is without merit simply because no one else had previously raised the issue. That is a novel proposition.

Without adding further verbiage to what, in composite, is a very lengthy opinion (majority plus two dissents), I would hold:

1. The balancing test is inappropriate to the PEER scope of negotiations.

2. PERB erred in finding the subjects of salary generation, out-of-state travel, promotions, summer employment, tenure, retrenchment, and personnel files were mandatorily negotiable.

3. PERB did not err in concluding the subject of salary allocation was mandatorily negotiable in limited form.