No. 45,089

THE KANSAS STATE BOARD OF HEALING ARTS, *Appellant,* v.
JOHN J. FOOTE, M. D., *Appellee.*

(436 P. 2d 828)

Opinion
filed January 27, 1968.

*John Anderson, Jr.,* of Olathe, argued the cause and was on the brief for the appellant.

*J. D. Lysaught,* of Kansas City, argued the cause, and *James Mize,* of Salina, was with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is an appeal by the state board of healing arts from a district court judgment reversing the board's revocation of a medical license.

The background of the controversy is as follows:

Doctor John J. Foote, appellee herein, by virtue of endorsement from the state of Pennsylvania, held a license to practice medicine and surgery in this state. After becoming a resident of Beloit,

Mitchell county, Kansas, he made application for membership as a surgeon on the medical staff of the Community Hospital of Beloit, a private corporation. The board of directors of that hospital rejected his application. Appellee then brought a mandamus action in the district court of Mitchell county to compel his admittance as a surgeon on the hospital's medical staff. The court sustained appellee's action and directed the hospital forthwith to admit appellee to its medical staff.

The hospital appealed that decision to this court, which reversed, directing that the hospital's motion for summary judgment be sustained (*Foote v. Community Hospital of Beloit*, 195 Kan. 385, 405 P. 2d 423), thus terminating appellee's surgical practice in that hospital.

Pending determination of the foregoing appeal, and generally during the period from October 1, 1964, to September 21, 1965, appellee performed surgery in the hospital, which institution subsequently became the Mitchell County Hospital.

Informal complaint respecting that practice was made to the state board of healing arts as a result of which a board member reviewed the hospital files and records of appellee's cases.

Thereafter a formal complaint against appellee was filed with the board, alleging that he had been guilty of unprofessional conduct in the handling of certain surgery cases and asking that his license to practice medicine be revoked.

Hearing was had before the board, at the conclusion of which it found "extreme incompetency by Dr. John J. Foote in the management of cases under his care and for such reasons, defendant has been guilty of unprofessional conduct" and revoked his license to practice medicine and surgery in Kansas.

Appellee appealed to the district court of Mitchell county, the appeal being presented on the complete record of the pleadings and evidence before the board; that court reversed the board's order of revocation, its ultimate ruling being summarized in the following:

### "FINDINGS OF FACT

"(1) John J. Foote is not professionally incompetent and the record herein does not support the Board's finding of extreme incompetence. On the contrary, such finding is unreasonable, arbitrary, oppressive, and discriminatory.

"(2) John J. Foote is not guilty of unprofessional conduct and the finding by The Kansas State Board of Healing Arts that he is guilty of unprofessional conduct is contrary to and not supported by the evidence.

"Conclusions of Law

"(1) The order of The Kansas State Board of Healing Arts revoking John J. Foote's license to practice medicine herein is arbitrary, unreasonable, oppressive, and discriminatory and is null and void and beyond the authority of the Kansas State Board of Healing Arts.

"(2) The attempt by The Kansas State Board of Healing Arts herein to extend the term, 'unprofessional conduct' as used in the healing arts law, K. S. A. 65-2836 and K. S. A. 65-2837 to include negligence or malpractice based upon a charge of negligence is not within the powers of the Kansas State Board of Healing Arts."

The trial court ordered appellee's license reinstated and the matter is now here on the board's appeal.

First, we should note the scope of judicial review of this type of proceeding.

Appeal to the district court from an order of the state board of healing arts in a revocation proceeding is authorized by K. S. A. 65-2848. Trial on such appeal is "upon the issues joined and presented upon the evidence and exhibits introduced before the board, and certified by the secretary thereof."

The board is composed of professional members from the three branches of healing arts: Medicine and surgery, osteopathy, and chiropractic (K. S. A. 65-2813). In the early case of *Meffert v. Medical Board*, 66 Kan. 710, 72 Pac. 247, 1 LRA n. s. 811, affirmed 195 U. S. 625, 49 L. ed. 350, 25 S. Ct. 790, involving revocation of the license of a medical practitioner this court discussed the function of the predecessor board to our present one, saying,

"The board of medical registration and examination is not a judicial tribunal. While it may be said to act *quasi*-judicially, it is only a ministerial board and performs no judicial functions. It is classed with such boards as the county boards of equalization, boards for the examination of applicants for teachers' certificates, city councils in granting and refusing a business or occupation license, and numerous other boards of similar character. Such boards perform no judicial functions, are not judicial tribunals, and have never been classed as such. [Citations]." (p. 715.)

Again speaking of the board of medical examination and registration in a revocation of license proceeding, this court in *Brinkley v. Hassig*, 130 Kan. 874, 879, 289 Pac. 64, pointed out that the board is an administrative body created under the police power of the state.

The business of licensing is regarded as an administrative function (*Lira v. Billings*, 196 Kan. 726, 414 P. 2d 13).

Many of our cases define the scope of judicial review in administrative proceedings.

In *Marks v. Frantz,* 183 Kan. 47, 325 P. 2d 368, we find this:

"2. While, in the nature of things, an administrative body, such as the optometry board, has wide discretion in determining its orders, such discretion cannot be abused and must actually be exercised reasonably in view of all of the facts and circumstances involved.

"3. Despite the fact an administrative body, such as the optometry board, cannot be the final judge of the reasonableness of its own orders, and despite the fact that courts are not permitted to substitute their judgment for that of such administrative body, nevertheless, courts are charged wih the solemn duty of determining whether the procedure employed in reaching the decision, or whether the decision itself as rendered, is unreasonable, arbitrary or oppressive under all of the circumstances of each particular case.

"4. The true test of the validity of an order of an administrative body, such as the optometry board, revoking a license to practice the profession in this state, is whether the findings of the board are supported by competent and substantial evidence, and, further, whether, in view of all of the facts and circumstances of the case, the order of revocation is unreasonable, arbitrary or oppressive." ( Syl.)

Recent cases dealing with the scope of judicial review of administrative actions include *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 386 P. 2d 515; *Boehm v. Board of County Commissioners,* 194 Kan. 662, 400 P. 2d 739; *Moyer v. Board of County Commissioners,* 197 Kan. 23, 415 P. 2d 261; *Board of County Commissioners v. Brookover,* 198 Kan. 70, 422 P. 2d 906; see also cases in 1 Hatcher's Kansas Digest, rev. ed., Administrative Law, 1968 Supp. § 1, p. 12; 2 West's Kansas Digest, Administrative Law, § 751.

Rules firmly emerging from this line of authority may be summarized thus: A district court may not, on appeal, substitute its judgment for that of an administrative tribunal, but is restricted to considering whether, as a matter of law, the tribunal acted fraudulently, arbitrarily or capriciously, whether the administrative order is substantially supported by evidence, and whether the tribunal's action was within the scope of its authority.

The business of licensing being an administrative or legislative function, as distinguished from judicial, any other interpretation of K. S. A. 65-2848 casting a wider scope of review upon a district court would render that statute unconstitutional as a violation of the separation of powers doctrine and we decline to so interpret the appeal statute.

Constitutional grounds aside, an interpretation permitting a wider scope of review, such as a *de novo* determination, would amount to

virtual disregard of the specialized nature of the board and make it a mere way station en route to the seat of real authority—the particular district judge to whose lot the appeal fell. Courts are not to be thus thrust into the licensing business.

And in reviewing the district court's judgment this court will in the first instance, for the purpose of determining whether the district court observed the requirements and restrictions placed upon it, make the same review of the administrative tribunal's action as does the district court (*Southwestern Bell Tel. Co. v. State Corporation Commission*, supra; 2 Am. Jur. 2d, Administrative Law, § 770, p. 673).

Appellee's principal contention is, and the trial court so found, that the board acted without authority in basing its order of revocation upon a finding of unprofessional conduct solely by reason of extreme incompetence in the management of cases under his care. The argument is this: K. S. A. 65-2838 authorizes the board to revoke or suspend a license granted under the healing arts act. 65-2836 enumerates eleven grounds for such action including ". . . (*b*) Immoral, unprofessional or dishonorable conduct. . . ." Concededly, this revocation is based upon "unprofessional conduct." 65-2837 provides:

"For the purpose of the preceding section, 'unprofessional conduct' shall consist of the following acts. . . ."

Here follows an enumeration of fifteen acts, none of which include or embrace incompetence, and none of which appellee has done. Therefore, it is contended, the board has unlawfully created an additional ground of revocation—extreme incompetence. Appellee points out our former law regulating the practice of medicine expressly provided that a license to practice medicine and surgery could be revoked for, among other things, malpractice (G. S. 1949, 65-1001) and that this provision was repealed in the enactment of our present healing arts act. Appellee argues the legislature must thereby have intended to delete "malpractice" as a ground for revocation. Appellee frankly asserts that even if a licensed practitioner of the healing arts has become *non compos mentis*, his medical license may not, because of a legislative gap, be revoked. Appellee argues legislative intent is clear that incompetence is not a ground for revocation but that if such intent be not clear then resort to the maxim of statutory construction *expressio unius est exclusio alterius* excludes incompetence as a ground for revocation.

Warrant for the exercise of any authority claimed by an administrative agency must be found within legislative enactment. Further examination of our statutes is in order.

In 1957 the legislature adopted our healing arts act (K. S. A. Chap. 65, Art. 28) and a related basic science act (K. S. A. Chap. 65, Art. 21). The purpose of the former is stated in K. S. A. 65-2801 as follows:

"Recognizing that the practice of the healing arts is a privilege granted by legislative authority and is not a natural right of individuals, it is deemed necessary as a matter of policy in the interests of public health, safety and welfare, to provide laws and provisions covering the granting of that privilege and its subsequent use, control and regulation to the end that the public shall be properly protected against unprofessional, improper, unauthorized and unqualified practice of the healing arts and from unprofessional conduct by persons licensed to practice under this act."

65-2802 defines "healing arts" and other terms used in the act. 65-2803 makes a license a prerequisite to the practice of any branch of the healing arts. 65-2805 authorizes the board to refuse to grant a license for any reason for which a license may be revoked. Other articles deal with the form, issuance, recording, annual renewal, and other aspects of licenses, and the appointment and qualifications of members of the board of healing arts. As indicated, 65-2836 provides for revocation of a license, with subsequent articles establishing the procedure. Further noteworthy is that one ground for revocation or suspension of a license is failure to take some form of postgraduate work each year as required by the board (65-2836 [k]). Finally, several provisions enjoin upon the board the administration and enforcement of the act (65-2812; 65-2864; 65-2865). The basic science act establishes procedures for obtaining a certificate of proficiency in the sciences of anatomy, physiology, chemistry, bacteriology and pathology, and prohibits the granting of a license to practice any branch of the healing arts to one not obtaining such certificate.

The objective always in statutory construction is to ascertain and give effect to legislative intent. In so doing, where police power is to be exercised, we must fairly read the entire context of legislation on the subject, rather than only an isolated section, and consider the object of that legislation and the evils or mischief sought to be prevented or remedied. The general purpose of the legislature as shown by the statute as a whole is of primary importance (*State, ex rel., v. Gleason*, 148 Kan. 1, 79 P. 2d 911).

The whole purpose and tenor of the healing arts act is the protection of the public against unprofessional, improper, unauthorized and unqualified practice of the healing arts. The goal is to secure to the people the services of competent, trustworthy practitioners. The act seeks to do this through licensure. The licensing by the state, granted only after minimal standards of proficiency are met, amounts to the state's recognition of the licentiate as a qualified practitioner. The continued holding of the license may be taken by the public as official indication those standards are being maintained. The object of both granting and revoking a license is the same—to exclude the incompetent or unscrupulous from the practice of the healing arts.

Our present act, consisting of ninety articles, is much more comprehensive than the one it supplanted (G. S. 1949, Chap. 65, Art. 10, 12 & 13). True, the old act established as ground for revocation of a license, and without further definition, malpractice or unprofessional conduct (G. S. 1949, 65-1001). The term "malpractice" may have either a general or a specific meaning. In legal, as distinguished from ordinary, terminology it is often used to connote a particular act of negligence, that is, a single isolated act, rather than a general lack of competence.

It could well be doubted if the legislature ever intended for a license to be revoked for a single remissive act. At least, there is considerable room in this area for the exercise of discretion. On the other hand, we know of nothing more vital to the purpose of the act than maintenance of competence in those licensed.

The doctrine of *expressio unius* has limited application (see discussion in *Johnson v. General Motors Corporation*, 199 Kan. 720, 722, 433 P. 2d 585, 589). Considering the entire policy expressed in the act, we believe the legislature, by enumerating certain acts and classifying them as unprofessional conduct, did not thereby intend to exclude all other acts or conduct in the practice of the healing arts which by common understanding render the holder of a license unfit to practice. It would indeed be difficult, not to say impractical, in carrying out the purpose of the act, for the legislature to list each and every specific act or course of conduct which might constitute such unprofessional conduct of a disqualifying nature. Nor does any such failure leave the statute subject to attack on grounds of vagueness or indefiniteness. Our statute makes no attempt to delineate what acts are included in the terms immoral

or dishonorable conduct, which are also made grounds for revocation. The determination whether by common judgment certain conduct is disqualifying is left to the sound discretion of the board.

Other courts have construed the term professional conduct as used in licensure acts. In *Reyburn v. Minnesota State Board of Optometry*, 247 Minn. 520, 78 N. W. 2d 351, the court stated:

" 'Unprofessional conduct' is conduct which violates those standards of professional behavior which through professional experience have become established, by the consensus of the expert opinion of the members, as reasonably necessary for the protection of the public interest." (pp. 523-524.)

In 41 Am. Jur., Physicians and Surgeons, § 49, pp. 175-176, we find this:

"No other ground for revocation is invoked as frequently, perhaps, as 'unprofessional,' 'dishonorable,' or 'immoral' conduct in connection with the practice of medicine or the particular branch or system thereof in which the licensee in question is engaged. Such conduct is specified as grounds for revocation in many of the statutes, and, as appears above, the validity of such statutes has been sustained by the courts in almost every instance. The quoted words, and other similar ones which are sometimes used in the statutes, are words of general, rather than exact and definite significance. The courts are in substantial accord, however, that they are to be construed to mean that which, by common understanding and genral opinion, is considered to be grossly immoral, dishonorable, or disreputable in connection with the practice of medicine. Thus, a statute authorizing revocation for 'immoral,' 'dishonorable' or 'unprofessional' acts or conduct contemplates conduct which either shows that the person guilty of it is intellectually or morally incompetent to practice the profession or has committeed an act or acts of a nature likely to jeopardize the interest of the public. . . ."

See also *State ex rel. Lentine v. State Board of Health*, 334 Mo. 220, 65 S. W. 2d 943, and *Sage-Allen Co., Inc. v. Wheeler*, 119 Conn. 667, 179 A. 195, 98 ALR 897.

No conduct or practice could be more devastating to the health and welfare of a patient or the public than incompetency; integral to the whole policy the legislature had in mind must be the power of the board to protect against it.

We conclude the board may revoke a license on the basis of extreme incompetence and in so doing here the board has not unlawfully created a new ground of revocation.

We turn to the question whether the board's order was substantially supported by evidence. To prove the complaint the board had before it the hospital records and files in all eleven of the surgical cases handled by appellee during the period in question

and testimony by two doctors from Concordia, two from Beloit and the director and a nurse in the Beloit hospital.

Highly summarized from a somewhat detailed record this evidence reveals the following: Appellee removed a patient's gall bladder, transecting the cystic duct and leaving it open. Instead of tying it he tied the common duct running into the stomach below the cystic duct stump, forcing bile into the abdominal cavity and causing acute bile peritonitis from which the patient died eight days later. During the time following the operation that the patient's condition had abruptly and obviously worsened appellee made no reexploration to find the cause of difficulty and did not seek consultation with another doctor until shortly before her death. Expert testimony was received indicating deviation from standard treatment in the surgery and in the failure to resort to reexploration or proper post-operative care and to seek consultation earlier.

Appellee operated a sixty-eight year old man for incarcerated femoral hernia; the patient had a history of emphysema; he was given a general pentothal induction and gas heater anesthesia; he wanted to go home and appellee released him after giving him tranquilizers; he had a high temperature and pulse rate and x-ray showed he had pneumonitis; he was not given any antibiotics; he died within forty-eight hours after release; on his death certificate appellee indicated cardiac failure as cause of death. Questioned was appellee's use of general instead of local anesthesia in view of the tendency of the former to cause lung congestion in persons with emphysema, failure to recognize a more grave condition of illness, early release from the hospital without further medication, and failure to designate a cause of death more appropriately on the death certificate.

A woman aged forty-three years was admitted for a hysterectomy. Prior to surgery a blood count was made showing twenty-six percent eosinophilia which is abnormal (normal is two to three percent); no further rechecking or tests were made prior to surgery; appellee performed the surgery, then did a bone marrow test to determine whether the patient had leukemia, malignancy or blood discretia. The surgery was not an emergency but was elective. Leukemia, which could create a bleeding problem in surgery, is only one of several serious diseases evidenced by a high eosinophilia count. Questioned was the failure to attempt to clarify cause of the abnormality, including rechecking for error, prior to surgery.

A thirty-eight year old woman was admitted to the hospital with diagnosis by appellee of tubal abortion. No pregnancy tests were made. He operated and found a normal two and one-half month pregnancy. He removed the appendix. A month later he re-admitted the patient with diagnosis of incomplete abortion. He scheduled her for elective dilatation and curettage and scraped out a fresh fetus with placenta tissue and fragments. A pathologist did not substantiate appellee's report that amniotic fluid was observed and necrotic placenta tissue obtained. The diagnostic procedures employed were questioned in several respects as well as the necessity for surgery.

Appellee operated another patient for incarcerated inguinal hernia which had reduced itself after anesthesia. Seven days after dismissal the patient was readmitted to the hospital with the diagnosis "post-operative left inguinal hernia with tension." Procedure questioned here was the fact "only two stitches were taken in the skin in this hernia to close the skin incision.

A frail lady aged seventy-three years was admitted to the hospital. Appellee ordered an x-ray which he read. He did not see air in the diaphragm and made no definite diagnosis from the x-ray. He first diagnosed possible cholecystitis, later acute pancreatitis. The patient died two days after admission. A radiologist, who had been available earlier but not used, read the x-ray as showing a large collection of free air in the right upper quadrant secondary to a perforated viscus, probably a duodenal ulcer. The autopsy report showed a perforated ulcer. The case records did not show use of intubation or a levine tube and stomach suction, which is fairly standard procedure.

Another case reviewed was that of a patient operated by appellee for incisional hernia due to a previous operation not performed by appellee; she re-entered the hospital for repair work by appellee; later he operated her again and a surgical mesh was put in; again it broke down and the patient entered another hospital for treatment which apparently was successful.

As to the questioned practices there was testimony that the care used did not measure up to the standard of that customarily used in the Beloit community.

An investigation was made by the Beloit hospital staff when appellee requested admission as a surgeon. Letters written respecting appellee's prior practice. One reply stated "his preopera-

tive judgment was poor and his postoperative care was bad, and that they would not recommend him as a surgeon." Another institution refused to put an opinion in writing but stated on the telephone "not to let him do major surgery, not to let him operate on his family, and if he was in the operating room he should be supervised." This information was repeated on a later occasion. Appellee brought two letters of recommendation from Halstead; one doctor stated he was an excellent surgeon and a fine doctor. Letters of recommendation from Pennsylvania were received but, in the opinion of the staff, they were not of a wording and type to offset the more recent one. One institution refused to furnish a letter but stated if required it would furnish testimony under oath. Ten members of the hospital staff voted against his admission to the staff. The only one voting for him was a doctor in his eighties who later assisted in appellee's surgery. When admitted pursuant to court order, appellee did not want to comply with a hospital rule requiring an assistant for major surgery.

Appellee testified in his own behalf. He also produced the testimony of the elderly doctor who assisted him in surgery and two owners of a drug store in Beloit, one of whom had been a long-time member of the hospital board of directors.

The lay testimony attacked the motives of the Beloit doctors who testified against appellee, attributing to them a conspiracy to keep other surgeons out of Beloit. One witness testified as to adverse personal rumors respecting appellee which were rife in Beloit; the board declined to consider any such evidence against appellee.

Appellee testified concerning his experience following graduation from Harvard medical school in 1938, including internships and residencies at various hospitals, naval service as a medical officer, and private practice for twelve years in a rural community in Pennsylvania. He was complimented upon his work when he left the latter. He left because two other surgeons opened a hospital and cut his income in half. After several months he came to a hospital at Topeka where for a year he did much general surgery. He then went to Hertzler Clinic with the understanding that if after one year it was mutually satisfactory, he would be taken into the staff; he did surgery therefor about a year when it was bilaterally understood he would not joint the staff. Thereafter he went to Beloit. He was certified by the American Board of Surgery in 1949 and became a fellow in the American College of Surgeons in 1950. He

did not think he had a psychiatric problem or that his decisions were impetuous.

Appellee reviewed the case histories already mentioned, explaining and defending his procedures, and generally refuted implications of incompetence.

He conceded error in the surgery and post-operative treatment of the gall bladder case and that he probably should have called for consultation earlier.

He stated the real cause of death of the hernia patient was "a psychological beating himself to death," a hysterical death, but he couldn't find words to put that on the death certificate. On reflection, he felt perhaps a local anesthetic would have been safer than a general, but he denied there were symptoms at the time of the patient's release from the hospital pointing to imminent death.

The hysterectomy patient showed no other leukemia symptoms at the time of her surgery and has shown none since release; a sternal biopsy was done during the primary surgery.

He may have received an inaccurate and incomplete history in the case of the suspected tubal abortion. He explained his decision to operate rather than considering a culdocentesis by stating he had been indoctrinated that he should "get in and look." He stated he was "not of the opinion that the tubal pregnancy was of a type that had caused a rupture and would cause immediate death." He conceded the patient should have had a repeat urinalysis with a catheterized specimen, which she did not have.

There was no difficulty with the inguinal hernia patient who was readmitted; he gave tranquilizers for tension and discharged the patient; he stated the hospital record which he made was confusing. Upon appellee's behalf the record is silent as to suturing used in this type of incision.

He testified the elderly woman was too weak to stand for an upright x-ray which would have more clearly disclosed air in the diaphragm; neither he nor his assistant saw any in the prone film; she was too ill to have undergone surgery even if it had been known she had a perforated ulcer.

The second hernia patient was a woman whose obesity presented a difficult problem. She was later reoperated at the university medical center and apparently healed; upon her return to Beloit she asked appellee for her release.

The elderly doctor who assisted in appellee's surgical cases testified generally in his behalf. There was also testimony as to the frequency of the severing of the common bile duct in gall bladder surgery.

The foregoing only highlights the evidence on both sides. Much of it is difficult to assess and weigh, illustrating why this kind of evaluation is best placed, in the first instance, in those particularly skilled by training and experience to interpret such matters, leaving the judicial role to that of determining substantiality of evidence.

The term "substantial evidence" has been defined by this court as evidence which possesses something of substance and relevant consequence, and which furnishes a substantial basis of fact from which the issues tendered can reasonably be resolved (see *Jibben v. Post & Brown Well Service,* 199 Kan. 793, 433 P. 2d 467, and cases therein cited).

The findings of the board of healing arts are not to be treated as sacrosanct; nevertheless, the board is the agency peculiarly qualified to predicate judgment on a scientific basis, and that judgment ought not be readily interfered with. The evidence here shows something much more serious than a mere professional slip, an improper handling of a patient on a single occasion. We think a fair estimate of the whole record before the board reveals substandard professional conduct adequate to support a conclusion of general incompetence. We hold the board's finding of extreme incompetence of a fellow practitioner was supported by substantial evidence. In reaching its conclusion to the contrary, as disclosed by its memorandum opinion, the trial court clearly weighed the evidence pro and con, made specific findings on the procedures employed and on the competency of appellee, and in effect made *de novo* findings of fact and substituted its judgment for that of the board, which it was not authorized to do.

The contention by appellee, and the finding by the trial court, that the board's order of revocation was arbitrary, unreasonable, oppressive and discriminatory is based primarily on alleged lack of substantial evidence to support a finding of incompetency. We have just disagreed. We find no merit in the additional matters complained of. Appellee was given ample notice and full opportunity to make his defense on all charges and there was an ex-

tended hearing before the entire membership of the board with fair determination.

The judgment of the district court setting aside the board's order of revocation of appellee's license to practice medicine was erroneous and that judgment is reversed.

APPROVED BY THE COURT.