No. 56,657

DONALD E. DANGERFIELD, PAMELA G. ELDER, and JONELE LEE HACKEROTT, *Appellants,* v. MONTGOMERY WARD CO., INC., *Appellee.*

(694 P.2d 439)

Opinion filed January 26, 1985.

*Anne L. Baker,* of Eidson, Lewis, Porter & Haynes, of Topeka, argued the cause and *K. Gary Sebelius,* of the same firm, and *Jerry K. Levy,* of Levy, Smith, Garrett & Smith, of Topeka, were with her on the brief for appellants.

*Grant M. Glenn,* of Cosgrove, Webb & Oman, of Topeka, argued the cause and *Edward L. Bailey,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: This is an appeal by three former employees of Montgomery Ward Co., Inc. (Ward) from a judgment of the district court which reversed an order of the Kansas Department of Human Resources (KDHR) awarding each claimant wages which it found were illegally deducted under the Kansas wage payment statutes (K.S.A. 44-313 *et seq.*) with interest and penalties. The claimants appealed and the case was transferred to the Supreme Court pursuant to K.S.A. 20-3018(c).

The basic facts are not in dispute. Donald E. Dangerfield, Pamela G. Elder and Jonele Lee Hackerott (the claimants) were all employed as commission salespersons in the Ward store at Topeka until each resigned in 1981. Dangerfield was employed from December, 1978, until in April, 1981; Elder from September, 1978, until in October, 1981; and Hackerott from June, 1979, until in April, 1981. Each claimant was employed pursuant to an oral employment contract and each received a paycheck

weekly. Ward acknowledges it is subject to the Kansas wage payment statutes and none of the claimants ever signed a written authorization allowing Ward to withhold, deduct or divert any portion of the wages earned (K.S.A. 44-319). Ward's pay plan consists of a formula utilizing several factors to determine the wages earned by commission salespersons. The wage formula considers (1) the number of hours worked during the week, (2) sales volume of the employee for the week, and (3) amount, if any, by which the employees' hourly wages exceeded six percent of sales for up to three prior weeks. The pay plan was described by the district court in the following terms:

"The employment agreement provides that claimants, as commission sales employees of respondent, are guaranteed a weekly wage computed on the basis of the hours worked by the employee multiplied by the employee's guaranteed hourly rate which is an amount at least equal to or greater than the federal minimum wage. Also, it is a part of the employment agreement that these employees are entitled to be paid weekly a sales commission computed on the basis of 6% of the employee's sales, when the commission exceeds the guaranteed weekly wage. The respondent's pay plan further provides that in those weeks where the employee's sales commissions are less than the guaranteed weekly wage, the employee is paid the guarantee; however, in this instance the difference between the commissions earned and the guarantee creates a deficit carryover which becomes a deduction from future sales commissions in excess of the minimum guarantee during the four-week period. The deficit carryover is reduced to zero every fourth week in the event that the total sales commissions earned during the period are less than the total amount paid to the employee as the guaranteed wage.

"Stated another way, respondent's employees are paid a guaranteed minimum wage or a 6% sales commission, whichever is greater, calculated over a four-week period."

A commission sales employee is paid each week the greater of (1) the guaranteed amount determined by multiplying the hours worked times the hourly rate or (2) the commissions generated from sales for the week less any accumulated deficits. The minimum amount of sales necessary to generate commissions in excess of the guaranteed minimum is figured weekly depending upon deficits incurred in the previous one to three weeks. The four-week periods used to calculate commission deficits do not begin on a fixed calendar basis but each period begins with the first week in which there is a deficit following the termination of a prior deficit period. For example, if an employee has sales upon which the commissions exceed the guaranteed minimum

for six weeks following the termination of a prior deficit period and then the commissions for the seventh week fall below the guaranteed minimum, a new deficit calculation period begins as of the seventh week and ends when the deficit has been eliminated or at the end of an additional three weeks, whichever occurs first. Under these circumstances an employee always gets a clean slate after the expiration of the four-week period or sooner if the deficit is made up in the second or third week of the particular period. Using $3.75 as the hourly wage, the guaranteed minimum that a salesperson would receive for a 40-hour week was $150.00. At no time did any of the claimants ever receive less than the minimum, that is $3.75 for each hour worked in a week. On some occasions when a claimant received more than the guaranteed minimum, he or she received less than 6% of the claimant's actual sales because the minimum paid during a preceding week exceeded the commissions on sales generated that week.

Dangerfield and Hackerott filed their claims with the KDHR on April 21, 1981, and Elder filed hers November 4, 1981. When asked for a complete statement of her claim and a description of her employment agreement as she understood it, Hackerott wrote:

"When hired for this commission sales job I was told that we would be on a 6% commission vs. $150.00 weekly draw. Meaning that there was a quota to be met and if I did not sell the quota amount I would be paid $150.00 a week for a 40 hr. work week. Then if more than the quota amount was sold the next week, the deficit from the week before was automatically taken from our pay. If the quota amount was not sold for five consecutive weeks then the deficit would be cleared and you would start then the next week without owing. I feel that our $150.00 draw was treated as an advancement on wages to be earned."

Dangerfield expressed a similar understanding of the employment agreement. Pamela Elder stated in her written claim:

"I understood that the pay was to be the $150 or 6% whichever was the greater. It was not understood that the $150 was to be like an advancement for the hours worked."

Following a hearing on January 26, 1983, the KDHR hearing officer issued an order containing findings of fact and conclusions of law. He determined Ward reduced the claimants' commissions illegally in violation of K.S.A. 44-319(a) and 44-321. He also found:

"12. That, the design of the wage policy itself suggests that Respondent had design, intent and purpose to illegally use 'deficits' to recoup amounts paid as guarantees and that as such, Respondent has knowingly and willfully failed to pay Claimants' commissions that it knew they had earned during their employment."

In his conclusions of law, the hearing officer stated:

"Deficits created in one workweek which are carried over and deducted from .commissions earned in subsequent workweeks violate K.S.A. 44-319(a)(3) as such deductions were neither authorized by the Claimants, nor were they for the purpose of accruing to the benefit of the Claimants."

He also concluded Ward owed Dangerfield $719.41; Hackerott, $425.48; and Elder, $1,109.38 plus interest on each amount at 10% per annum and, in addition, he assessed a 100% penalty under K.S.A. 44-315(b) for willful nonpayment of wages. Ward appealed to the district court pursuant to K.S.A. 60-2101(d).

On appeal the district court reversed the order of the hearing officer finding that the sole issue was "whether or not the subject employment contract is a violation of the Kansas Wage Payment Act . . . ." So phrased, the trial judge then determined the issue was "clearly a question of law" on which he was not bound by the KDHR's legal conclusions. See *Wallis v. Secretary of Kans. Dept. of Human Resources*, 236 Kan. 97, 689 P.2d 787 (1984). The district court found the Ward commission plan was consistent with the employment agreement between the parties and that it did not violate the Kansas wage payment statutes, particularly K.S.A. 44-319(a)(3). The claimants have appealed.

At the outset the appellants contend the district court did not follow the proper scope of review and did not give proper deference to the KDHR's conclusions of law and its interpretation of the employment contract. We find no merit in these contentions. While the trial court did not dwell at length on the proper scope of review it did recognize our holding in *Kansas Board of Healing Arts v. Foote*, 200 Kan. 447, 436 P.2d 828 (1968), which has been cited and followed repeatedly on the issue. See also *Yuille v. Pester Marketing Co.*, 9 Kan. App. 2d 464, 682 P.2d 676 (1984), wherein a comprehensive discussion of the issue is contained in an opinion by Judge Buchele, the same trial judge who decided this case, which was adopted as the opinion of the Court of Appeals. The trial court determined that the sole issue was one of law based upon the facts as found by the

KDHR and then applied the proper scope of review. Appellants also contend that the district court did not give sufficient deference to the interpretation by the KDHR of the employment contract and the statutes. We agree with the district court that the sole issue was one of law and although the action of the KDHR has been said to warrant "great deference," it is equally clear that a question of law "is always open to review by the courts." *Wallis v. Secretary of Kans. Dept. of Human Resources*, 236 Kan. 97, Syl. ¶ 2. We find no error in the scope of review utilized by the district court and in the weight it gave to the conclusions of law and interpretations of the employment contract by the KDHR.

Next the appellants contend the trial court erred in its construction of the employment contract and in concluding the contract did not violate K.S.A. 44-319(a)(3). The district court, in its memorandum decision, stated:

"We begin our analysis [of whether the Ward employment contract violates the Kansas wage payment statutes] with the premise that an employer and an employee may contract for payment of wages in any manner. This is made clear in *Sweet v. Stormont-Vail Regional Medical Center*, 231 Kan. 604, 647 P.2d 1274 (1982), wherein the Court stated:

'Parties have wide discretion in fixing the terms of employment contracts, and when the employment contract is not contrary to law or unreasonable in its terms, it should be honored and enforced by the courts.'

231 Kan. at 608. The Kansas Wage Payment Act itself is consistent. The definition of wages found in K.S.A. 44-313 provides:

'Wages means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis less authorized withholding and deductions.'

The Act also requires regular pay periods, at least monthly. K.S.A. 44-314.

'In this case the employment agreement between the claimants and the respondent was oral. There is no issue presented in this appeal as to its terms nor is there a contention that the claimants did not agree to and understand the terms and conditions of the employment agreement from the inception of their employment or that they were ever paid less than the federal minimum wage. And it is not contended that the respondent violated the employment agreement. Since the parties are free to contract for the payment of wages on any basis so long as it is not contrary to law, the issue here becomes whether or not the subject employment contract is a violation of the Kansas Wage Payment Act, K.S.A. 44-313 *et seq.*' "

The district court found that the Ward employment contract did not violate the wage payment statutes and we agree.

K.S.A. 44-319(a)(3), upon which the KDHR hearing officer and the appellants rely, provides:

"(a) No employer may withhold, deduct or divert any portion of an employee's wages unless: . . . (3) the employer has a signed authorization by the employee for deductions for a lawful purpose accruing to the benefit of the employee."

The basic issue in this case is in the determination of what constitutes "wages" under the Ward employment contract. As hereinbefore defined in K.S.A. 44-313, wages means compensation for labor or services rendered whether the amount is determined on a time, task, piece, commission or *other basis*. The KDHR hearing examiner, relying on the term "commission" in the statute, determined as a matter of law that the 6% commission figure when applied to any week's sales becomes wages, under the statute, for that week from which Ward could not "withhold, deduct or divert any portion" without the signed authorization of the employee. The flaw in the hearing examiner's reasoning is that the 6% commission was only one element to be considered in determining the actual wages earned during any particular computation period. We see nothing to prevent the use of a combination of the factors in K.S.A. 44-313 in arriving at the actual wages of the employee so long as the same does not violate any other statute or the agreement of the parties. In rejecting the claimants' argument that each week's sales generated a final sales commission constituting wages under the statute, the district court stated:

"This argument ignores the fact that 'commissions earned' is but one factor in the calculation by which the employee's wages are determined. Under the pay plan a final reconciliation is made every four weeks to determine the net amount of earned wages for that period which is within the maximum monthly pay period permitted by the statute. We conclude that a proper construction of the subject wage payment plan for purposes of the Kansas Wage and Hour Act is that the pay period here is four weeks due to the reconciliation feature of the pay plan. As we stated above, an employer and employee are free to contract the terms of compensation and it is the employment agreement of the parties that determines the method of wage computation. We see no reason why the parties may not contract to include provisions for reconciliation of deficit carryover against sales commissions to determine the final amount of wages due when it is done within a four-week pay period. This construction of the employment contract renders it compatible with the Kansas Wage and Hour Act.

. . . .

"The Order of the Hearing Officer equates the amount of weekly commissions earned under the pay plan with 'wages' as defined by the statute. He must therefore conclude that the subject compensation plan is based on a weekly pay

period. This holding rewrites the employment agreement to provide that the employee should be paid weekly the minimum guarantee or a 6% commission on sales for that week, whichever is greater. Such a conclusion is not supported by the employment agreement between the claimants and the respondent. In *Sweet v. Stormont-Vail Regional Medical Center, supra,* the Court stated:

'When an employee is made aware of company policy, which is a part of the terms of the employment contract, the employee will be held to those terms.'

231 Kan. at 611. We cannot find in the situation presented here that either the spirit or the letter of the Wage Payment Act has been violated and therefore the terms of the employment agreement should be upheld."

Judge Buchele found nothing in the underlying purposes of the wage payment statutes which would prohibit pay plans such as this by stating:

"The available legislative history of the 1973 session for House Bill 1429 which contains the applicable statutes is not contrary to our application of the law. The primary purpose of the legislation was to protect employees from the docking or shorting of pay to cover alleged shortages. There was a recognition that the absence of statutory constraints served as an invitation to employers to withhold from an employee wages earned, and benefits such as vacation pay, contributions to pension and welfare funds, and to otherwise manipulate and prey upon employees through misleading statements relative to the terms and conditions of employment. There is nothing in the Minutes and Statements of the House Committee on Labor and Industry which is analogous to the situation presented here."

Appellants argue strenuously that the Ward pay plan violates the statutes because the four-week period used to calculate any deficit in commissions is not on a fixed basis tied to the calendar but begins only when a deficit has occurred. It is contended that Ward is manipulating the four-week compensation period to its benefit and to the detriment of the employees. Examples, from the pay records of the claimants, are cited to show that if the four-week period were established regularly according to the calendar each and every four weeks throughout the claimants' employment there would be occasions when the employee would have received more in compensation than was received. However, a careful review of the record indicates the reverse is also true. There are instances when a claimant actually received more compensation, due to the cancellation of deficits existing at the end of the four-week computation period, than would have been received if calculated on a fixed four-week calendar basis. Nothing in our statutes requires payment of wages on the basis of

a four-week period. K.S.A. 44-314 requires that "[e]very employer shall pay all wages due to his or her employees at least once during each calendar month . . . ." We have been unable to discern, and none has been pointed out by appellants, any way in which the Ward pay plan violates this provision of the statute. Regardless of when any particular wage computation period begins the employee receives all wages due, either by payment in full or by wiping the slate clean as to any deficit at least once each calendar month. Then a new wage calculation period does not commence until a deficit occurs. That was the agreement of the parties and we find nothing illegal in the procedure.

As we view it, the plan adopted by Ward assures each commission salesperson that he or she will receive a regular paycheck each and every week. The weekly check is never less than the federal minimum wage for the number of hours worked and in Topeka customarily is more than the minimum wage due to job market conditions. Each employee is secure in knowing that a weekly paycheck will be received for at least the actual hours worked even if no sales are made by the employee. Stability and regularity for the employee is assured and the commission plan provides an incentive for the salesperson to increase his or her sales resulting in an increase in compensation. The quota required before a commission is earned, even though adjusted weekly during any particular computation period for prior deficits, in no way reduces the guaranteed minimum which has already been received by the employee. The cancellation of any existing deficit at the end of the four-week wage computation period assures the employee that deficits will not accrue to the point that commission income over and above the guaranteed minimum would be impossible to achieve. In addition, it meets the statutory requirement for payment of "all wages at least once each calendar month."

The record does not disclose that any of the claimants ever questioned or objected to the method of calculating compensation during their employment. Each was furnished weekly, along with that week's paycheck, a statement of the status of the commission account so each salesperson knew each week what the quota would be for the next week's sales to generate commissions in excess of the guaranteed minimum. The payment

plan was that contemplated by the employment agreement and we find it does not violate the Kansas wage payment statutes. In view of the decision reached it is not necessary that we consider the issues of interest and penalties.

The judgment is affirmed.