(733 P.2d 330)

No. 59,10█

JEFF BANNON, *Appellant,* v. KANSAS REAL ESTATE COMMISSION,
*Appellee.*

—

Opinion filed
January 22, 1987.

*Jack Focht* and *Christine M. Tamburini,* of Focht, Hughey & Hund, of
Wichita, for appellant.

*Mark A. Buck,* of Davis, Wright, Unrein, Hummer & McCallister, of Topeka,
for appellee.

Before DAVIS, P.J., PARKS and MEYER, JJ.

DAVIS, J.: The plaintiff, Jeff Bannon, appeals from an order of
the Shawnee County District Court affirming an order of the
defendant, Kansas Real Estate Commission (Commission), re-
voking Bannon's Kansas real estate broker's license.

Jeff Bannon, who was a licensed Kansas real estate broker,
operated Jeff Bannon Auction and Realty, Inc. Bannon special-
ized in the sale of farms, ranches, and suburban real estate. He
employed through his company two licensed real estate sales-
persons, Jeff Lange and Tim Moore. The circumstances giving
rise to the formal charges before the Commission involve two
separate sales referred to by the parties and in this opinion as the
"Hattan" and "Coulter" transactions. Essential facts concerning
both of these transactions are set forth below.

HATTAN TRANSACTION:

Bannon was contacted by Garland Moore Hattan concerning
the sale of an 80-acre farm in Sedgwick County. On December
20, 1982, Jeff Lange obtained a listing agreement requiring Jeff
Bannon Auction and Realty to use due diligence to find a buyer
on terms and conditions acceptable to the seller and for not less
than $100,000. No commission was to be charged to the seller.

Lange obtained two offers, one from Otis Melcher in an
amount of $120,000, and another from Lawrence Girrens in an

amount of $128,000. At about the same time, Bannon indicated he had an offer of $100,000 through his attorney and friend, John Callahan. Without disclosing the purchaser, this offer was taken to Hattan. Hattan was not informed of the outstanding offers for more than $100,000, although it was clear that Lange had informed Bannon of both the Melcher and Girrens offers. Lange did inform Hattan that the $100,000 offer was a conduit or "clearinghouse" for the ultimate purchaser. Hattan accepted the $100,000 offer and sold the property to Aero Capitol Investment, Inc., a company effectively controlled by Bannon. Within a few days, Aero Capitol Investment, Inc., sold the farm to Lawrence Girrens for $128,800. Bannon and his salesman, Lange, divided the profits equally.

COULTER TRANSACTION:

Ruby Coulter owned 834 acres of land in Greenwood County. In September 1982, Tim Moore contacted Mrs. Coulter. Bannon and Moore executed a listing agreement with Mrs. Coulter on October 6, 1982. Pursuant to this agreement, her property was listed for sale at $305,450. Mrs. Coulter informed Bannon she had attempted to sell the property to Glen Rupe, but was unable to consummate a sale.

After obtaining the listing contract, Bannon contacted Glen Rupe and became satisfied that Rupe would buy the property for $350,000. The initial conversation between Bannon and Rupe included some terms of payment. This information was not relayed to Mrs. Coulter.

Instead, Bannon presented to Mrs. Coulter an offer from Aero Capitol Investments, Inc., to purchase the property for $300,000. She accepted this offer on November 21, 1982. Two days later, Aero Capital Investments, Inc., contracted to sell the same property to Rupe for $350,000.

On January 24, 1983, Bannon persuaded Mrs. Coulter to sign another contract from Aero Capital Investments, Inc., for the sum of $270,000. The $30,000 difference represented the amount Mrs. Coulter paid to her tenant as a buyout of his lease agreement.

On April 18, 1983, the sale between Mrs. Coulter and Aero Capitol Investments, Inc., closed. Mrs. Coulter received $242,177.91; it is not clear what the additional $27,822.09 de-

duction represented. Bannon then had Aero Capitol Investments, Inc., close the sale to Rupe for $350,000.

A complaint-notice of hearing was issued by the Commission to Bannon May 1, 1984. The provisions of the licensing law and regulations at issue in the hearing were as follows:

K.S.A. 58-3062(a)(18): "No licensee shall: . . . Engage in fraud or make any substantial misrepresentation."

K.S.A. 58-3062(a)(6): "No licensee shall: . . . Act in a dual capacity of agent and undisclosed principal in any transaction."

K.S.A. 58-3061: "(a) Each broker shall maintain, in the broker's name or the broker's firm name, a separate trust account in this state designated as such, in which all down payments, [and] earnest money deposits . . . received in a real estate transaction by the broker . . . or salespersons on behalf of a principal or any other person shall be deposited or invested unless all parties having an interest in the funds have agreed otherwise in writing."

K.A.R. 1982 Supp. 86-3-15: "(a) Each licensee shall, within ten days, report in writing to the commission the following information:

"(1) Litigation involving the sale of real estate . . . in which the licensee or the licensee's real estate company is named as a plaintiff or defendant. The report shall include the nature of the allegations, or the licensee shall furnish a copy of the petition.

"(2) Disposition of litigation reported pursuant to this regulation."

K.A.R. 1982 Supp. 86-3-9: This regulation sets out the duty to recommend that the parties retain an attorney to pass upon legal questions involved in the transaction.

After a full evidentiary hearing, the Commission made the following conclusions of fact and law:

"Sedgwick Property [Hattan Transaction]

"The Commission concludes that the evidence is clear and convincing that Jeff Bannon initiated and perpetrated a fraud upon Garland Moore Hattan, executor of the estate of Bertha M. Rudin, R. K. Moore, in the following respects:

"(a) Bannon was the agent of the seller Hattan and also the undisclosed principal of the Hattan/Aero transaction.

"(b) The offer from Callahan/Property Investment was not a legitimate offer but a deceit.

"(c) Bannon had a duty to disclose to Hattan both the Melcher offer and the Girrens offer as these were legitimate offers.

"(d) Failure to do so constitutes a breach of duty to seller Hattan, self-dealing at the expense of Hattan, and a fraud perpetrated upon him. This is a violation of K.S.A. 58-3062(a)(18).

"(e) Failure to disclose to Hattan that he was the principal in the transaction was a violation of K.S.A. 58-3062(a)(6).

"(f) The Commission concludes that Jeff Bannon failed to comply with the requirements of K.S.A. 58-3061 by depositing the Girrens' down payment in Callahan's trust account.

"(g) The evidence is clear and undisputed that Jeff Bannon violated Commission Rule 86-3-15.

"Greenwood Property [Coulter Transaction]

"The Commission concludes as follows:

"(a) Jeff Bannon acted in the dual capacity of agent and undisclosed principal in the transaction between Ruby Coulter and Aero Capitol Investment, Co., Inc. in violation of K.S.A. 58-3062(a)(6).

"(b) Jeff Bannon by engaging in self-dealing, perpetrated a fraud upon Mrs. Coulter by failing to inform her of Glen Rupe's willingness to purchase her property for $350,000.00, representing by implication that $300,000.00 was the best offer he had, in violation of K.S.A 58-3062(a)(18).

"(c) Counsel admitted in his opening statement that his client, Jeff Bannon, failed to report the litigation as required. There is evidence that a case was filed by Glen Rupe on August 25, 1983. There is no evidence that this litigation was reported. However, there is no testimony in the records that it wasn't. The Commission only has the comments of counsel to base a conclusion that Rule 86-3-15 was violated in respect to the Rupe litigation.

"(d) The Commission finds nothing in the record that addresses the issue of Rule 86-3-9. Mr. Rupe had counsel available to him and presumably used that counsel on other occasions, as well as the matter before this Commission. The Commission concludes the evidence as insufficient to show a violation of Rule 86-3-9."

Based upon these conclusions, the Commission revoked plaintiff's Kansas broker's license.

The district court reviewed the record on appeal. It upheld the findings and conclusions except for the conclusion that K.A.R. 1982 Supp. 86-3-15 was violated in the Coulter transaction. Bannon timely appealed, raising four issues: (1) Whether the district court applied the proper scope of review; (2) whether the order of the Commission was arbitrary and capricious on its face; (3) whether an agency relationship existed and, if so, whether the court properly interpreted the extent of any agent duties; and (4) whether reliance upon legal advice is a mitigating factor in a real estate broker's disciplinary proceeding.

The parties agree that K.S.A. 58-3058(d) prescribes the scope of review for the Commission's and trial court's orders. Although the statute was amended in 1984 (L. 1984, ch. 313, § 89), the amendments are not applicable to this case. See K.S.A. 77-605. We, as well as the district court, apply the following limited standard of review:

"A district court may not, on appeal, substitute its judgment for that of an administrative tribunal, but is restricted to considering whether, as a matter of

law, (1) the tribunal acted fraudulently, arbitrarily or capriciously, (2) the administrative order is substantially supported by evidence, and (3) the tribunal's action was within the scope of its authority." *Pioneer Container Corp. v. Beshears*, 235 Kan. 745, Syl. ¶ 1, 684 P.2d 396 (1984).

Plaintiff's first contention is based upon the language used by the district court in its order affirming the actions of the Commission. Because the trial court used the term "sufficient evidence" in affirming three of the findings of the Commission, instead of the term "substantial evidence," Bannon claims that it must have applied an improper scope of review. Bannon does not argue there was a lack of substantial evidence to support the Commission's order.

We are charged with making the same review of defendant's order as did the district court. *Pioneer Container Corp. v. Beshears*, 235 Kan. at 746. If there was substantial evidence to support the findings and conclusions of the Commission, it becomes immaterial whether such evidence is described as substantial or sufficient.

The term "substantial evidence" is defined as that evidence "which possesses something of substance and relevant consequence, and which furnishes a substantial basis of fact from which the issues tendered can reasonably be resolved [citations omitted]." *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, 459, 436 P.2d 828 (1968).

We have carefully reviewed the testimony, the Commission's findings of fact and conclusions of law, and the order of the trial court. We conclude there was a substantial basis in fact for the conclusions of the Commission and the trial court. Plaintiff's contention that the trial court employed an improper standard in reviewing the order of the Commission is without merit.

Next, Bannon contends that the order of the Real Estate Commission was arbitrary and capricious on its face. This contention is based primarily upon the different penalties imposed by the Commission upon the salespersons and broker. Because Bannon's license was revoked, while Lange received only a public censure and no action was taken against Moore, Bannon claims the Commission's action is arbitrary and capricious. This contention is wholly lacking in merit.

Plaintiff's argument ignores the differing responsibilities be-

tween salespersons and brokers. See K.S.A. 58-3061(a); K.S.A. 58-3062(c); K.S.A. 58-3039(c); K.S.A. 58-3060. In *Coggins v. Public Employee Relations Board,* 2 Kan. App. 2d 416, 420, 581 P.2d 817 (1978), *rev. denied* 225 Kan. 843 (1978), this court observed: "Despite . . . seeming inconsistency, arbitrariness has not been shown. As long as its findings are supported by evidence and in turn support the conclusion, an administrative tribunal is free to emphasize different approaches in individual cases." "Arbitrary, oppressive or capricious conduct is shown 'where an order of an administrative tribunal is based upon findings which are not substantially supported by evidence in the record.' " *U.S.D. No. 461 v. Dice,* 228 Kan. 40, 50, 612 P.2d 1203 (1980) (quoting *Neeley v. Board of Trustees, Policemen's & Firemen's Retirement System,* 212 Kan. 137, Syl. ¶ 3, 510 P.2d 160 [1973]). The findings of the Commission are supported by the evidence and unquestionably support revocation of Bannon's broker's license.

Bannon next contends that because of his unique position in effecting sales and subsequent sales of the properties involved, he was not an agent of the sellers. If deemed to be an agent, he claims the court improperly interpreted the extent of his duties with reference to the sales and subsequent sales of the properties involved. Bannon attempts to separate the two sales in each transaction. He claims that he acted not as agent for the sellers, but represented Aero Capitol Investment, Inc., as purchaser and seller of the properties involved. His legal arguments ignore the facts.

Bannon listed the property in both the Hattan and Coulter transactions. He knew of outstanding offers substantially higher than the amount for which he had listed the property, but failed to disclose them to the sellers. He or his agent then presented lower offers to the sellers from a corporation that he controlled, Aero Capitol Investment, Inc. He caused Aero Capitol Investment, Inc., to purchase the properties involved and resold the two parcels of property for a substantial profit based upon offers he received, but failed to communicate to the original seller.

Bannon also claims that, because he charged no commission to the original sellers, he had no fiduciary duty to the sellers and no obligation to disclose the other offers. We have no hesitancy in

concluding that his responsibility throughout these transactions involved a fiduciary duty to the sellers. As a Kansas real estate broker, his statutory duties were crystal clear. He breached these duties for his personal gain at the expense of Mr. Hattan and Mrs. Coulter. The conclusions of the Commission and the affirmance of those conclusions by the district court clearly delineate the responsibilities of Bannon with reference to these transactions.

Finally, Bannon argues that his reliance upon the advice of John Callahan, a long-time friend and legal advisor, is a mitigating factor that should have been taken into consideration by the Commission in assessing the penalty. Bannon's attorney, John Callahan, apparently advised him that there was no violation of any real estate law because there was no fiduciary relationship unless the seller was going to pay him for his services. Since he charged no commission to the sellers in these transactions, he claims that, in relying upon his attorney's advice, he thought he had no fiduciary responsibility to the sellers of the property. He acknowledges that this does not excuse him from liability, but claims "he should not be punished for [his attorney's] malfeasance" and "should not suffer the revocation of his license as a result of receiving poor legal advice."

One has only to review the facts in this case to discover the lack of merit in Bannon's argument. Based upon fraud and misrepresentation, Bannon and his salesperson split approximately $28,000 in profit at the expense of Mr. Hattan. In another instance Bannon, without informing the owner who listed the property with him of a $350,000 offer, helped close the sale for $300,000 and thereafter resold the property for $350,000. In both instances, Bannon used a sham corporation to accomplish the first sale, thereby enabling him within a short period of time thereafter to effect the final sale, resulting in substantial personal monetary gain. His reliance upon legal advice in no way diminishes his fraud.

It was not the attorney's malfeasance, but rather the double-dealing and fraud of Bannon that concerned the Commission. We find that the evidence overwhelmingly supports the action of the Commission and the order of the district court.

The purpose of the real estate broker's license act is "to protect the public from the fraud, misrepresentation, and imposition of

dishonest and incompetent persons." *Thomas v. Jarvis*, 213 Kan. 671, Syl. ¶ 1, 518 P.2d 532 (1974). *Richardson v. Simpson*, 88 Kan. 684, 687, 129 Pac. 1128 (1913), provides the rationale for the power of an administrative body to restrict the abilities of licensees to practice: "The revocation of a license by reason of such misconduct is not regarded as a punishment for a past wrong, but as a protection to the public for the future."

Affirmed.